**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Donald G. FORD, Defendant–Appellant.**

No. 98–5154.

United States Court of Appeals,
Sixth Circuit.

Argued April 23, 1999.

Decided May 19, 1999.

J. Douglas Wilson (argued and briefed), U.S. Department of Justice, Appellate Section, Criminal Division, Washington, D.C., Stevan E. Bunnell, U.S. Department of Justice, Public Integrity Section, Washington, D.C., for Plaintiff–Appellee.

R. Kent Westberry (briefed), Landrum & Shouse, Louisville, KY, David B. Smith (argued), English & Smith, Alexandria, VA, for Defendant–Appellant.

Before: KEITH, MERRITT, and DAUGHTREY, Circuit Judges.

## OPINION

KEITH, Circuit Judge.

Defendant, Donald G. Ford, appeals his jury conviction and sentence for conspiracy to obstruct justice and obstruction of justice. For the reasons discussed below, we **AFFIRM** the lower court.

## I. INTRODUCTION

After being convicted on November 22, 1996 for money laundering and gambling offenses, Defendant was arrested on charges of jury tampering. The United States alleged that he contacted a juror during the money laundering and gambling trial. On November 25, 1996, the government moved to detain Defendant without bond pending his trial on the jury tampering charges. At a hearing on the motion, evidence was presented that during the same week that Defendant allegedly contacted the juror, an employee of the U.S. Attorney's office found a piece of paper in the lobby of the building where the U.S. Attorney's Office is located. The paper had the name, home address, telephone number and license plate number of an Assistant U.S. Attorney who was one of the prosecutors in the gambling and money laundering prosecution. Also on the piece of paper was the name "Charles Simpson" with a telephone number and residential address. Chief Judge Charles Simpson was the presiding judge in the money laundering/gambling trial. However, the address and telephone number were not those of Chief Judge Simpson but belonged to a different Charles Simpson. Defendant acknowledged that the handwriting was his own.

Furthermore, the government was able to produce testimony that Defendant asked witnesses in the gambling case to lie to the grand jury and that he made threatening statements about witnesses he believed to be cooperating with the government. Based on the aforementioned testimony that Defendant was threatening witnesses and collecting information on the trial judge and a prosecutor, the magistrate judge accordingly ordered Defendant held without bail pending trial. After a jury trial in the United States District Court for the Eastern District of Kentucky, Defendant was convicted of conspiracy to obstruct justice, in violation of 18 U.S.C. § 371, and obstruction of justice, in violation of 18 U.S.C. 1503. Defendant was sentenced to 35 months imprisonment, to be followed by three years supervised release, and fined $75,307.43. This appeal followed.

## II. FACTUAL BACKGROUND

On December 9, 1996, the U.S. Attorney's office received an unsolicited letter from a prisoner being held at the Floyd County Jail. The writer of the letter stated that he had been Defendant's cell mate and had information about "plans" of the Defendant that did not "sound too good. Maybe a person's life and other things [sic]." The informant stated that Defendant had claimed to have arranged for associates in Atlantic City, New Jersey to kill the Assistant United States Attorney who was the prosecutor in the gambling and money laundering trial, an IRS agent, and a Louisville Police Department officer. According to the informant, Defendant also stated that his Atlantic City associates would blow up a car lot owned by the juror he had contacted during the gambling trial. The United States also represented that a polygraph test was performed on the informant and the test did not indicate untruthfulness.

On December 13, 1996, the grand jury returned an indictment charging Defendant with obstruction of justice, witness tampering, and conspiracy to obstruct justice. On December 16, 1996, an informant, wearing a concealed recording device, was placed in Defendant's cell at the Oldham County Jail where Defendant was being held. Their three hour conversation was recorded but Defendant failed to mention any plans to have any person killed. The tape recording was placed in a sealed envelope.

Consequently, the U.S. Attorney's office was recused from further participation in the jury tampering case and prosecutors from the Criminal Division's Public Integrity Section became responsible for the matter. On February 3, 1997, the grand

jury returned a superseding indictment that re-alleged only the two counts of the December 13 indictment relating to Defendant's contact with the juror in the gambling and money laundering trial. The Public Integrity Section prosecutors did not listen to the tape of the informant and Defendant until after the grand jury returned the superseding indictment.

## III. ANALYSIS

On March 7, 1997, Defendant filed a motion to suppress the tape recorded statements that the informant had obtained from him. In his motion, Defendant requested that the district court preclude the government from using any evidence derived directly or indirectly from the recorded statement, and to disqualify all government counsel that had been exposed to the recorded statement from any further participation in the case. In response, the United States declared that it would not make any direct or indirect evidentiary use of the recorded statement at trial. On September 17, 1997, the district court denied Defendant's suppression motion without an evidentiary hearing. The court found that "[t] he issue of suppression was moot as the government agreed not to use the tape recording, or its evidentiary fruits at trial."

Defendant insists that the government acted improperly and in violation of his Sixth Amendment rights when it placed the informant in his jail cell and tape recorded their ensuing conversation. Moreover, Defendant argues that the district court should have conducted an evidentiary hearing to establish that the government made no use of the fruits of the alleged Sixth Amendment Violation. Additionally, Defendant contends that the government's actions violated the ethical proscription on contacts with represented parties, and the district court should have sanctioned the violation by disqualifying the government's trial prosecutors.

The aforementioned claims by the Defendant are clearly devoid of merit. There is ample evidence in the record which demonstrates that the government not only acted properly in orchestrating the interview between the informant and the Defendant, but it would have been negligent in its duty to protect the public from potential harm had it not taken the appropriate steps to investigate the informant's allegations that Defendant had threatened witnesses and law enforcement officials. Thus, because the government agreed not to make any use of the December 16 conversation between the informant and Defendant in the case under indictment, Defendant received the appropriate remedy that he was entitled to for a Sixth Amendment violation.

 The magistrate judge's findings of fact, as adopted by the district court, are reviewed under the clear error standard. *See United States v. Hill,* 142 F.3d 305 (6th Cir.1998). The issue as to whether or not the Defendant is entitled to an evidentiary hearing and to disqualification of counsel is a legal question subject to de novo review. *United States v. Grable,* 98 F.3d 251, 253 (6th Cir.1996).

*A. The Government Acted Appropriately When It Placed An Informant In Defendant's Cell*

 Law enforcement officials have a duty to investigate new or additional crimes that an indicted and represented defendant may have committed. *Maine v. Moulton,* 474 U.S. 159, 180, 106 S.Ct. 477, 488, 88 L.Ed.2d 481 (1985) (recognizing "public's interest in the investigation of criminal activities" by defendant who had been indicted on other offenses); *United States v. Terzado–Madruga,* 897 F.2d 1099, 1110–11 (11th Cir.1990) (recognizing that government has a legitimate and often compelling interest in continuing its investigation of the suspected criminal activities of a defendant who has already been indicted or formally charged with a crime). Since performance of this duty is a neces-

sary prerequisite of effective law enforcement, the Supreme Court has clearly established that law enforcement officials may question an indicted defendant who has invoked his right to counsel if the questioning relates to offenses other than those that form the basis for his/her indictment. *See McNeil v. Wisconsin,* 501 U.S. 171, 175–76, 111 S.Ct. 2204, 2207, 115 L.Ed.2d 158 (1991); *Maine v. Moulton,* 474 U.S. at 179–80, 106 S.Ct. 477, 478, 88 L.Ed.2d 481 (1985).

■ Accordingly, the fact that law enforcement officials arranged for an informant to converse with an indicted defendant about offenses other than those for which the defendant had been indicted is not unlawful. *See Terzado–Madruga,* 897 F.2d at 1111–12. Thus, if an informant "deliberately elicits" incriminating statements relating to the charged offense, the defendant is entitled to suppression of those statements in the trial on the charged offense, but the Sixth Amendment raises no bar to the initiation of the interview itself or to the use of any statements that incriminate the defendant on uncharged offenses. *See Kuhlmann v. Wilson,* 477 U.S. 436, 459, 106 S.Ct. 2616, 2629, 91 L.Ed.2d 364 (1986); *see* also *Massiah v. United States,* 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964).

As the magistrate concluded in the present matter, when the government placed the informant in Defendant's cell, there was a reasonable good faith belief that Defendant had made threats of a significant nature to law enforcement officials and witnesses. First, at the time Defendant and the informant had their conversation, Defendant was being detained on charges of jury tampering and obstruction of justice. Those charges stemmed from the illegal contact Defendant had with a juror from his trial on charges of money laundering and gambling and for which he was ultimately convicted. Second, Defendant admitted that a piece of paper, which contained the names and address of the Assistant United States Attorney and the

trial judge in his gambling and money laundering trial, was in his handwriting. Lastly, the government received direct testimony from the informant that Defendant had threatened a federal prosecutor and law enforcement officials. Moreover, the informant passed a polygraph examination administered to ascertain whether the information he was supplying was reliable.

Defendant vigorously disputes that the motive of the government was to investigate the alleged threats made by the Defendant. However, Defendant fails to articulate how the government's motive in initiating the conversation between the informant and Defendant is relevant to Defendant's Sixth Amendment claim. *See Nix v. Williams,* 467 U.S. 431, 445, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984) (rejecting requirement that government must act in good faith in securing evidence in order to rely on inevitable discovery exception to the exclusionary rule). The issue is whether the government or an agent of the government has sought to elicit incriminating statements from the defendant relating to charged offenses. If yes, the appropriate remedy is to suppress the illegally obtained statements regardless of the government's purpose.

■ Nonetheless, Defendant's contention lacks merit. As mentioned above, the United States Attorney's Office and the FBI initiated the interview between the Defendant and informant after receiving allegations of potential acts of violence and threats to law enforcement officials and witnesses. It is well settled that when the government or its agents obtain statements during an undercover jailhouse interrogation of an indicted and represented defendant, any statement concerning the indicted offense must be suppressed. *See United States v. Henry,* 447 U.S. 264, 100 S.Ct. 2183, 65 L.Ed.2d.115 (1980). Hence, the government had no incentive whatsoever to intentionally violate the Defendant's Sixth Amendment rights. If the government had set out to violate the Defendant's Sixth Amendment rights, logic

dictates that the prosecutors would not have created direct evidence by tape recording the conversation. Clearly, there is no basis for Defendant's accusation that the government acted inappropriately in arranging the jailhouse interrogation with the informant, and the district court did not err by denying Defendant a hearing to inquire into the motivations of the government.

## B. Kastigar *Hearing*

As mentioned above, the government had agreed to refrain from making any use at trial of Defendant's statements to the informant. Defendant nevertheless insists that the government may have made "derivative use" of his statements to the informant and thus, the district court should have held a hearing similar to the one in *Kastigar v. United States*, 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972), at which the government would have been required to prove that none of the evidence it sought to introduce at trial was derived directly or indirectly from the Defendant's statements. Moreover, Defendant argues that the government had the burden of proving that it did not make "non-evidentiary" use of his statement which, in his opinion would include, "assistance in focusing the investigation, refusing to plea bargain, interpreting evidence, and otherwise generally planning trial strategy." *United States v. McDaniel*, 482 F.2d 305, 311 (8th Cir.1973). However, Defendant neglects to describe any actual "derivative or non evidentiary" use that the government made in this case. Thus, the district court properly concluded that the only remedy Defendant was entitled to was suppression of the incriminating statements on the charged offenses, and that Defendant was not entitled to a *Kastigar* style hearing.

In *Kastigar*, the Supreme Court held that in any subsequent criminal prosecution of a person granted immunity to testify, the prosecution bears the burden of affirmatively proving that all evidence proposed for use at trial was derived from legitimate sources totally independent of the compelled testimony. Use of the compelled testimony is not only prohibited but any and all evidence derived from that compelled testimony is likewise inadmissible. A hearing of this type requires the prosecution to present all of the evidence intended for trial and identify the sources of that evidence to make sure that it was not derived from or based on the inadmissible compelled testimony. A review of the evidence "must proceed witness by witness; if necessary, it will proceed line by line and item by item." *United States v. North*, 910 F.2d 843, 872 (D.C.Cir.1990), cert. denied, 500 U.S. 941, 111 S.Ct. 2235, 114 L.Ed.2d 477 (1991). Although the rationale for a *Kastigar* hearing is based on the Fifth Amendment's prohibition against compelled self incrimination, the Defendant in this matter contends it also applies in cases involving alleged violations of the Sixth Amendment's right to counsel. However, the Defendant was unable to produce any authority for the proposition that a *Kastigar* hearing is required or even permissible in the context of alleged violations of the Sixth Amendment right to counsel.

Accordingly, the issue of suppression is moot as the government has agreed to refrain from using the tape recorded conversation between Defendant and the informant or its evidentiary fruits at trial.

## C. There Is No Basis For Disqualification Of Counsel

Defendant argues that counsel for the United States violated Rule 4.2 of the Kentucky Rules of Professional Conduct and consequently should be disqualified as a result. Rule 4.2 states:

> In representing a client, a lawyer shall not communicate about the subject of the representation with a party the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized by law to do so.

Kentucky Supreme Court Rules 3.130, Rule of Professional Conduct 4.2.

Although the government's trial prosecutors of the Criminal Division's Public Integrity Section had no role in the conversation that took place between Defendant and the informant, Defendant contends that the district court should have disqualified them because they were "exposed" to the results of the other federal prosecutors' alleged violation of Kentucky Rule of Professional Conduct 4.2.

However, we find no violation of Rule 4.2 occurred. First, as mentioned above, there is significant precedent permitting law enforcement officials to contact represented defendants by means of an undercover informant to investigate allegations of criminal wrongdoings other than the offense on which the defendant has been indicted. *See Maine v. Moulton,* 474 U.S. at 180, 106 S.Ct. at 477. Thus, ethical rules should not be construed to conflict with the public's vital interest in ensuring that law enforcement officers investigate uncharged criminal activity. Since the government performed their job in accordance with the law by investigating Defendant's alleged threats, no ethical violation has occurred.

Second, Rule 4.2 specifically states that "a lawyer shall not communicate about the subject of the representation ..." Since prosecutors were investigating an offense other than the offense for which Defendant was indicted, the contact does not pertain to the "subject matter of the representation" as Rule 4.2 states. Any other deviation of this interpretation of Rule 4.2 would place prosecutors at risk of committing an ethical violation for pursuing actions that they are required to pursue in the interest of public safety.

## IV. CONCLUSION

For the foregoing reasons, the decision of the Honorable Edward H. Johnstone of the United States District Court for the Western District of Kentucky is **AFFIRMED.**