RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2002 FED App. 0401P (6th Cir.)
File Name: 02a0401p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

UNITED STATES OF AMERICA,
      *Plaintiff-Appellee,*

            *v.*

RANDALL COPE (00-5794)
and TERRY WAYNE COPE
(00-5797),
      *Defendants-Appellants.*

Nos. 00-5794/5797

Appeal from the United States District Court
for the Eastern District of Kentucky at Covington.
No. 99-00033—Jennifer B. Coffman, District Judge.

Argued: September 20, 2002

Decided and Filed: November 19, 2002

Before: DAUGHTREY, GILMAN, and GIBSON, Circuit
Judges.[*]

_____

[*]The Honorable John R. Gibson, Senior Circuit Judge of the United
States Court of Appeals for the Eighth Circuit, sitting by designation.

1

_____

**COUNSEL**

**ARGUED:** Harry P. Hellings, Jr., HELLINGS & PISACANO, Covington, Kentucky, Kevin M. McNally, McNALLY & O'DONNELL, Frankfort, Kentucky, for Appellants. Frederick A. Stine V, ASSISTANT UNITED STATES ATTORNEY, Covington, Kentucky, for Appellee. **ON BRIEF:** Harry P. Hellings, Jr., HELLINGS & PISACANO, Covington, Kentucky, Kevin M. McNally, McNALLY & O'DONNELL, Frankfort, Kentucky, for Appellants. Frederick A. Stine V, Edwin J. Walbourn III, ASSISTANT UNITED STATES ATTORNEYS, Covington, Kentucky, Charles P. Wisdom, Jr., ASSISTANT UNITED STATES ATTORNEY, Lexington, Kentucky, for Appellee.

_____

**OPINION**
_____

RONALD LEE GILMAN, Circuit Judge. Brothers Randall Cope and Terry Cope (collectively, the Copes) were indicted on eleven counts of attempted murder and firearm violations. The Copes were convicted by a jury on ten of the counts. Randall was subsequently sentenced to 567 months' imprisonment and Terry to 502 months' imprisonment. Both now appeal, raising a myriad of issues. For the reasons set forth below, we **AFFIRM** the judgments of the district court.

### I. BACKGROUND

This case centers around allegations relating to the attempted murders of Sarah Jackson, Elizabeth and Ronald Nimmo, and former Assistant United States Attorney (AUSA) David Bunning. Jackson is Randall's former fianceé, and Elizabeth Nimmo, who is married to Ronald Nimmo, is Terry's ex-wife. AUSA Bunning represented the government in pretrial proceedings involving the Copes.

On May 8, 1998, Randall was arrested on a complaint of internet harassment and credit card fraud. Randall had allegedly logged on to the e-mail account of Jackson without her permission and sent threatening and harassing e-mail messages to Jackson's acquaintances. He also used her credit card to purchase computer equipment on the internet. Jackson had terminated her relationship with Randall in November of 1997.

At the time of his arrest, Randall consented to the search of his car by law enforcement officers. The search uncovered a .38 caliber revolver. Randall posted bond, was released, and his trial date continued until February 1, 1999.

In the interim, Marshall County, Kentucky law enforcement officers arrested Randall on December 26, 1998 for sending harassing communications in the form of nude pictures of Jackson that Randall had placed on the driveway of Jackson's father. As a result, Randall's bond stemming from the complaint of internet harassment and credit card fraud was revoked, and he was returned to jail to await trial.

At some point before Randall's bond was revoked—the time period, let alone the exact date, is unclear from the record—Shirley Shepherd, an acquaintance of the Copes and a local gun dealer, had a conversation with Randall. Randall told him that Terry "had a problem and that if [Terry] didn't have a witness against him, that . . . his brother would [no longer] have a problem." The problem that Randall was referring to involved state criminal charges that were pending against Terry in Tennessee. He then explained to Shirley that he would pay $25,000 for someone "to get the job done."

Randall's sister posted bond for Jason Griffith, one of Randall's cellmates, on January 17, 1999. In exchange for the bond money, Griffith agreed to "knock off" Jackson. Randall told Griffith to wait for a telephone call, a call that Griffith never received. He then told Griffith that a member of Randall's family would kill Jackson if Griffith could not do so. Randall expressed similar sentiments to one of his business partners, Charles Stewart. He asked Stewart if he

knew why Jackson did not want to date him. Stewart responded by saying that Jackson was afraid Randall would kill her. Randall replied that he would not kill her, but that he knew people who would kill her for him.

On January 22, 1999, ten days before Jackson was scheduled to testify against Randall regarding the internet harassment and credit card fraud charges, someone fired gunshots at the car in which Jackson and her son were sitting as they were about to pull out of their home's garage in Florence, Kentucky. Five bullets, which were fired from a .38 caliber revolver, penetrated Jackson's car. The rifling characteristics showed that the bullets could have been fired from one of three .38 caliber revolvers later found at the home of the Copes' father or from the .38 caliber revolver discovered four months later in the yard of Terry's house. But the bullets also could have been fired from any of 50 to 100 million other handguns with the same rifling characteristics.

Jackson did not see who fired the shots. She believed, however, that Randall played a role in the shooting due to the tumultuous nature of their relationship, the fact that Jackson had testified at Randall's detention hearing and was scheduled to testify at his trial, and Randall's having confided in her that he wished to have his ex-wife, Sandy, who currently resides in Denver, Colorado, killed with an unregistered gun.

Randall talked to two other fellow inmates, James Hiatt and Carl Clay, about his desire to have Jackson killed. The day after the shooting, Randall told Clay that "if something happened to him (Randall), . . . someone in his family would kill her." After Randall talked with Hiatt about having Jackson killed, Hiatt contacted a Federal Bureau of Investigation agent, who told Hiatt to give Randall the name "Bill" if Randall approached him again about killing Jackson. The agent also supplied Hiatt with the phone number of Bill, who was in actuality an undercover sergeant with the Campbell County Policy Department.

the district court did not abuse its discretion in denying Terry's motion to sever.

### III. CONCLUSION

For all of the reasons set forth above, we **AFFIRM** the judgments of the district court.

error, it would have been harmless in light of the overwhelming evidence of Terry's guilt. *Cf. Coy v. Iowa*, 487 U.S. 1012, 1021 (1988) (Confrontation Clause violation subject to harmless error analysis).

### c.   Severance of counts

Terry's final argument is that the district court erred when it denied his motion to sever the counts relating to the plots to murder Jackson, the Nimmos, and AUSA Bunning. We will reverse a district court's denial of a motion for severance of counts only if the denial constituted an abuse of discretion. *United States v. Jacobs*, 244 F.3d 503, 506 (6th Cir. 2001).

Rule 8(a) of Federal Rules of Criminal Procedure permits "[t]wo or more offenses [to] be charged in the same indictment . . . if the offenses charged . . . are of the same or similar character or are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan." Severance of joined offenses is permitted, however, if such joinder would be prejudicial. Fed. R. Crim. P. 14; *see also United States v. Critton*, 43 F.3d 1089, 1097-98 (6th Cir. 1995) (stating that "Rule 14 allows for severance [i]f it appears that a defendant or the government is prejudiced by a joinder of offenses or of defendants") (internal quotation marks omitted) (alteration in original). Nonetheless, a jury is presumed capable of considering each count separately, *United States v. Rugerio*, 20 F.3d 1387, 1391 (6th Cir. 1994), and any prejudice may be cured by limiting instructions, *Jacobs*, 244 F.3d at 507. Moreover, an appellant must show that the denial of his motion for severance of counts affected his "substantial rights." *United States v. Chavis*, 296 F.3d 450, 461 (6th Cir. 2002).

Terry has failed to establish that the denial of his motion to sever counts affected his substantial rights. In fact, it is clear that the jury was able to consider each count separately, because it acquitted Terry on all charges related to the alleged plot to murder AUSA Bunning. We therefore conclude that

Randall subsequently asked Hiatt if Bill would "take care of somebody for him." When Hiatt replied that it would be possible, Randall wrote to Terry: "I found someone who can handle all our jobs. He . . . will do whatever needs to be done. He typically works locally here, but is willing to travel out of town to do special jobs assuming the money is right. Bill @ 341-5125. Supposedly very reasonable, quiet (no issues), and able to do anything." He later wrote to Terry: "[Bill] recently did a job for a guy I met. In less than a week, he produced the desired results. And all the guys [sic] problems were eliminated permanently. . . . He has access to dynamite, blasting caps & fuses . . . ."

Randall wrote four other incriminating letters. The first, written on February 12, 1999, was addressed to his parents, apprising them that five "warning shots" had been fired into Jackson's car from a distance of three to five feet. On March 17, 1999, Randall wrote a letter to Terry, requesting that Terry ask their father to meet with "the Hungarian," a contract killer, allegedly to arrange for the murders of the Nimmos. Randall subsequently wrote a letter dated March 21, 1999 to Terry to tell him that Jackson would likely testify against Randall regarding the internet harassment and credit card fraud charges because she was "fully committed to trying to get me sent to prison." He also told Terry to contact the "drywall contractor" and to "handle business" for him, meaning that Terry was to find a contract killer to murder Jackson. The fourth, the so-called "Daddy (for your eyes only) letter," was written to his father on March 29, 1999 and reads in pertinent part as follows:

> Given that I'm in here, there's some unsavory business you need to handle. Contact our friend . . . and inquire about the Hungarian, & whether or not he's still going to Tuesday's market. . . . Wearing . . . gloves, put $2500 cash in each of . . . 3 envelopes now. Go to the market unannounced starting Tuesday taking the above with you. . . . Once you meet the [Hungarian] (he's aware that there's work to be done & is interested), take him for a walk where you are not overheard. Tell him about a

dream you had where you needed a problem resolved permanently either by *accident* or a *disappearance*, and either are permanent. . . . The deposit should be about 2 envelopes. . . . Make sure you are wearing gloves when you handle these envelopes. . . . If you're not up to doing this, tell Terry to tell me you can't do the job I asked you to do. If I don't get out, he'll have to handle it, which is what we don't want. . . . If you can't connect with the Hungarian or for some strange reason he's changed his mind, I've got a contact out of Paducah.

Randall's father showed the letter to Terry, and the two of them went to a market in search of the Hungarian, where they were told that the Hungarian "no longer existed." The government contends that the Copes sought to pay the Hungarian to kill the Nimmos.

According to the government, this was not the first time that one of the Copes had sought the services of the Hungarian. Randall had previously asked Shirley Sheppard about the availability of the Hungarian in order to arrange for the murder of the Nimmos.

On April 6, 1999, the same day that Terry and his father visited the market, Terry went to the United States Attorney's Office in Covington, Kentucky. Upon entering the building, Terry took out a large pocket knife and asked an administrative assistant if it was considered a weapon. He asked to see AUSA Bunning, but was told that Bunning was unable to meet with him. Terry then left the building.

Later that afternoon, Terry, who had previously arranged a meeting with "Bill," met Bill in Florence, Kentucky. Terry instructed Bill to kill Jackson, and he provided Bill with Jackson's full name and address. He also told Bill that Jackson's car already had bullet holes in it and laughed that Jackson was "gun shy." Bill agreed to kill Jackson for $5,000, half of which he requested immediately. Terry then gave Bill an envelope containing $2,500.

cured even if the jury is instructed to consider the confession only as evidence against the codefendant. *Id.* In *United States v. Bartle*, 835 F.2d 646, 651 (6th Cir. 1987), this court extended the *Bruton* principle by holding that a defendant's Sixth Amendment right to confront witnesses is violated not only when the court admits the *confession* of a nontestifying codefendant, but also any *statement* made by a codefendant that implicates the accused. The right to confront witnesses does not apply, however, when the nontestifying codefendant's testimony is admitted pursuant to a hearsay exception, *White v. Illinois*, 502 U.S. 346, 356 (1992) (holding that "where proffered hearsay has sufficient guarantees of reliability to come within a firmly rooted exception to the hearsay rule, the Confrontation Clause is satisfied"), or for nonhearsay purposes, *Tennessee v. Street*, 471 U.S. 409, 414 (1985) (holding that "[t]he nonhearsay aspect of [the codefendant's] confession—not to prove what happened at the murder scene but to prove what happened when [the defendant] confessed—raises no Confrontation Clause concerns").

Terry points to the admission of various statements that allegedly violated his Sixth Amendment rights: Jackson's repetition of comments by Randall that he wanted to kill his ex-wife; Charles Stewart's conversation with Randall in which Stewart told Randall that Jackson was scared of Randall; Shirley Sheppard's knowledge of the connection between the Hungarian and Randall; the testimony of Randall's father that Randall stated his intent to distribute more nude photographs of Jackson; Griffith's, Hiatt's, and Clay's conversations with Randall; and Randall's letters that he wrote while incarcerated. Most of this evidence, however, does not implicate Terry. For example, Jackson's comments, Sheppard's knowledge of the connection between the Hungarian and Randall, the testimony of the Copes' father, and Stewart's conversation with Randall have no bearing on Terry's guilt. The remaining evidence, to the extent that it implicated Terry, fits within well-established hearsay exceptions or was admitted for nonhearsay purposes. Furthermore, even if there had been a Confrontation Clause

Rule 14 of the Federal Rules of Criminal Procedure allows for "relief from prejudicial joinder." "Severance is required 'only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence.'" *Walls*, 293 F.3d at 966 (quoting *Zafiro*, 506 U.S. at 539). A joint trial of codefendants who present mutually antagonistic defenses is not prejudicial per se. *Zafiro*, 506 U.S. at 538. Moreover, a trial court's limiting instructions may "cure" such prejudice. *Id.* at 539.

The Copes have failed to show how the denial of their motion for severance prejudiced their rights to a fair trial. The district court's numerous limiting instructions ameliorated any potential prejudice. Finally, although it is debatable whether the Copes presented antagonistic defenses, they have failed in any event to show that their respective defenses misled or confused the jury. *Cf. United States v. Horton*, 847 F.2d 313, 317 (6th Cir. 1988) ("To prevail [on a motion for a severance], the defendants must show that antagonism between co-defendants will mislead or confuse the jury.") (internal quotation marks omitted).

### b.    *Confrontation Clause*

Terry further argues that his conviction should be reversed because the district court admitted hearsay statements by his nontestifying codefendant, in violation of his rights secured by the Confrontation Clause of the Sixth Amendment. We will reverse a conviction based on the admission of evidence only if the district court abused its discretion in admitting the evidence. *General Elec. v. Joiner*, 522 U.S. 136, 141 (1997).

The Confrontation Clause provides that "in all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI. An accused is deprived of his rights under the Confrontation Clause when the confession of a nontestifying codefendant that implicates the accused is introduced into evidence at their joint trial. *Bruton v. United States*, 391 U.S. 123, 137 (1968). This violation of the accused's rights is not

Toward the end of their conversation, which Bill was surreptitiously recording, Terry suggested that he had other people he wanted Bill to murder "down south," so long as the Jackson murder went according to plan. Although there was no direct evidence regarding who else Terry wanted Bill to kill, the government claims that Terry was referring to the Nimmos, who live in Tennessee.

Law enforcement officers arrested Terry at the end of his conversation with Bill. While interrogating Terry, the officers requested Terry's permission to search his truck. Terry acquiesced and accompanied them to the truck, where the officers found another envelope containing approximately $2,500, as well as several of Randall's incriminating letters, including the "Daddy (for your eyes only) letter."

On May 3, 1999, a federal grand jury in the Eastern District of Kentucky indicted Randall and Terry on eleven counts, including conspiring to murder, attempted murder, attempted murder to retaliate against a witness, use and discharge of a firearm during a crime of violence, possessing a firearm while subject to a domestic violence protection order, possessing a firearm while under indictment for a felony offense, using the mail with the intent that murders be committed, and threatening to murder. Randall and Terry pled not guilty to all counts.

The case proceeded to trial on January 24, 2000. On February 3, 2000, the jury convicted Randall and Terry on all counts except those relating to the alleged plot to kill AUSA Bunning. After denying their motions for acquittal, the district court sentenced Randall to 567 months' imprisonment and Terry to 502 months' imprisonment. Randall and Terry then filed this timely appeal.

### II. ANALYSIS

### A.    Sufficiency of the evidence

When presented with a challenge to the sufficiency of the evidence to support a conviction, "the relevant question is

whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original). In making this determination, we "refrain from independently judging the credibility of witnesses or [the] weight of the evidence." *United States v. Walls*, 293 F.3d 959, 967 (6th Cir. 2002). All reasonable inferences are to be drawn in the government's favor. *United States v. Kelly*, 204 F.3d 652, 656 (6th Cir. 2000). "Even circumstantial evidence may sustain a conviction so long as the totality of the evidence was substantial enough to establish guilt beyond a reasonable doubt." *Walls*, 293 F.3d at 967.

### 1.   *Randall's conviction*

Randall argues that the government did not present sufficient evidence to establish his guilt with respect to counts two, four, five, nine, and ten. Randall, however, was neither charged with nor convicted on count five, so we will turn our attention to the evidence supporting the remaining challenged counts.

#### a.   *Count two*

Count two charged that Randall aided and abetted Terry in attempting to kill Jackson with the intent of preventing her attendance and testimony at Randall's upcoming trial, all in violation of 18 U.S.C. § 1512(a)(1). The government accordingly needed to prove that (1) Jackson was scheduled to be a witness at an upcoming judicial proceeding against Randall, (2) Terry attempted to kill Jackson, (3) Terry did so knowingly and wilfully with the intent to prevent the attendance or testimony of Jackson, (4) Randall helped, commanded, induced, or encouraged Terry to commit the crime, and (5) Randall intended to help Terry commit the crime.

Randall's only argument concerning the sufficiency of the evidence to establish his guilt on count two was that he was not involved in the January 22, 1999 shooting. The evidence

omitted the references to a specific type of firearm and to the owner of the firearm.

Terry has not identified any authority that mandates the production of the original indictment for the jury. Moreover, Terry has not explained why the refusal to provide the original indictment to the jury compounded any error regarding the admission of the guns. Nor has he shown how the refusal to provide the original indictment to the jury prejudiced him in any manner. We therefore find no error relating to the district court's refusal to provide the original indictment to the jury.

### 5.   *Severance*

Randall and Terry both argue that the district court erred in refusing to sever their cases. Terry further contends that the failure to sever the cases resulted in the introduction of "rampant hearsay statements" by a nontestifying codefendant (i.e., his brother Randall), and thus violated his rights under the Confrontation Clause of the Sixth Amendment. Finally, Terry maintains that the district court erred in refusing to sever the various counts of the indictment.

#### a.   *Severance of cases*

We will reverse a district court's decision to deny a motion for severance of codefendants only if the denial constituted an abuse of discretion. *United States v. Walls*, 293 F.3d 959, 966 (6th Cir. 2002). For the sake of promoting efficiency and avoiding the potential for inconsistent verdicts, joint trials of defendants who are indicted together are actually encouraged rather than discouraged. *Zafiro v. United States*, 506 U.S. 534, 537 (1993); *see also* Fed. R. Crim. P. 8(b) (stating that "[t]wo or more defendants may be charged in the same indictment . . . if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses"). This is especially true when two defendants are accused of participating in a conspiracy or joint scheme. *United States v. Weiner*, 988 F.2d 629, 634 (6th Cir. 1992).

did not raise this issue prior to trial, even though the facts underlying his argument were apparent before the trial commenced, we are precluded from considering the merits of his contention. *See id.* (holding that the defendant's claim of prosecutorial misconduct in initiating a prosecution was waived because he "fail[ed] to raise this objection in a timely fashion").

### 3.   *Prosecutor's slide presentation*

Terry next argues that the district court erred in denying his motion for a mistrial based on the government's slide presentation, because the slide presentation referred to the Copes' conspiring to kill AUSA Bunning. We employ an abuse-of-discretion standard when reviewing the district court's denial of a motion for a mistrial. *United States v. Yang*, 281 F.3d 534, 549 (6th Cir. 2002).

Terry was in fact acquitted on the charges regarding the attempt to murder AUSA Bunning. This undermines his position that prejudice resulted from the government's slide presentation. We therefore conclude that the district court did not abuse its discretion in denying Terry's motion for a mistrial.

### 4.   *Original, superseded indictment*

Terry makes vague allegations of error regarding the district court's refusal to admit into evidence the original indictment in this case. We review the district court's refusal to permit the jury to view the original indictment under an abuse-of-discretion standard. *United States v. Scales*, 594 F.2d 558, 561 (6th Cir. 1979).

Terry maintains that the district court's refusal to provide the original indictment to the jury "compounded the error in the improper admission of the four guns," and thus warrants a new trial. The original indictment alleged that a particular gun owned by the Copes' father was used in the commission of the January 22 shooting. The superseding indictment

belies his contention. Randall solicited numerous individuals, both before and after the shooting, to kill Jackson, who was scheduled to testify against Randall at his upcoming trial on February 1, 1999 regarding the internet harassment and credit card fraud charges. Moreover, Randall's February 12, 1999 letter addressed to his parents mentioned that five "warning shots" had been fired into Jackson's car from a distance of three to five feet. Although Randall could have found out details about the shooting after it occurred (perhaps from a newspaper article or from family or friends), his knowledge of specific facts about the shooting strongly indicate that he was intimately involved in the plot.

Randall wrote a letter to Terry on March 21, 1999, telling Terry that Jackson was likely to testify against Randall because she was "fully committed to trying to get me sent to prison." In the same letter, Randall asked Terry to contact the "drywall contractor" and to "handle business" for him, their code words for finding a contract killer to murder Jackson.

Finally, Jackson was scheduled to testify against Randall only ten days after the shooting incident. This fact, by itself, does not conclusively establish that Randall "helped, commanded, induced or encouraged" the shooting. But all of the abovementioned facts, considered together and in a light most favorable to the government, were sufficient to permit a rational trier of fact to have found beyond a reasonable doubt that the government proved all of the elements at issue in count two against Randall.

#### b.   *Count four*

Count four charged that Randall aided and abetted Terry in knowingly using and carrying a .38 caliber handgun during and in relation to a crime of violence and, in so doing, discharging a firearm, all in violation of 18 U.S.C. § 924(c)(1)(A). Under this count, the government was required to establish that (1) Terry committed the crime alleged in count two, (2) Terry knowingly used a firearm during and in relation to Terry's alleged commission of that crime, (3) Randall helped, commanded, induced, or

encouraged Terry to commit the crime, and (4) Randall intended to help Terry commit the crime.

Randall's only defense to count four again consisted of his argument that he was simply not involved in the January 22, 1999 shooting. For all of the reasons stated above, however, we find his argument to be without merit.

### c.    Count nine

Count nine charged that Randall knowingly and voluntarily conspired to use the mail with the intent that the murders of the Nimmos be committed, in violation of 18 U.S.C. § 1958(a). The government needed to prove that (1) Randall conspired to use the mail with the intent that the murders of the Nimmos be committed in consideration of money to be paid a contract killer, (2) Randall knowingly and voluntarily joined the conspiracy, and (3) a member of the conspiracy—either Randall or Terry—did one of the overt acts described in paragraphs 31 to 33 of the indictment to advance or help the conspiracy.

Randall argues that there was insufficient evidence tying him to the alleged conspiracy. The circumstantial evidence offered by the government, however, which the jury apparently accepted, provided a sufficient link. First, Randall asked Shirley Sheppard in 1998 about the availability of the Hungarian, allegedly to have the Hungarian kill the Nimmos. Second, Randall's March 17, 1999 letter to Terry instructed him to ask their father to meet the Hungarian, also with the intent of having the Nimmos murdered at that time. A third link is found in Randall's "Daddy (for your eyes only) letter," which discussed Randall's plans for either Terry or their father to contact the Hungarian for the purpose of killing the Nimmos. Finally, a rational juror could have agreed with the government's contention that Terry's asking Bill whether he "did any work down south" was a reference to having Bill kill the Nimmos.

evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original).

Entrapment occurs when the government's actions "implant in the mind of an innocent person the disposition to commit the alleged offense and induce its commission." *United States v. Tucker*, 28 F.3d 1420, 1423 (6th Cir. 1994). Accordingly, Randall must show that (1) the government induced him to commit a crime, and (2) he lacked the predisposition to engage in the criminal activity. *United States v. Burns*, 298 F.3d 523, 539 (6th Cir. 2002).

The evidence amply shows that Randall was predisposed to engage in the criminal activity of which he was accused. Randall told Jackson on numerous occasions that he wanted to have his ex-wife killed with an unregistered firearm. Moreover, Randall's conversations with fellow inmates Clay, Hiatt, and Griffith, as well as his letters to his family, show a convincing predisposition to engage in the murderous plots against Jackson and the Nimmos.

### 2.    *Prosecutorial misconduct*

Terry contends on appeal that the United States Attorney's Office for the Eastern District of Kentucky should not have prosecuted the case because (1) Terry was accused of attempting to murder Bunning, one of the AUSA's in that office, and (2) the prosecutors used his case to advance their careers. In short, Terry claims that the AUSA who prosecuted his case was "an interested prosecutor" with a conflict of interest.

"Defects and objections based on defects in the institution of the prosecution," however, "must be raised prior to trial." Fed. R. Crim. P. 12(b). "[T]he policy behind the rule is twofold: restriction of 'sandbagging' by the defense to create a basis for a post conviction motion; and resolution of legal questions prior to the expense of trial." *United States v. Ospina*, 18 F.3d 1332, 1336 (6th Cir. 1994). Because Terry

government or the criminal defendant is more to blame for that delay, whether, in due course, the defendant asserted his right to a speedy trial, and whether he suffered prejudice as the delay's result." *Doggett v. United States*, 505 U.S. 647, 651 (1992).

"Until there is some delay which is presumptively prejudicial, there is no necessity for inquiry into the other factors that go into the balance." *Barker v. Wingo*, 407 U.S. 514, 530 (1972). A one-year delay between accusation and the beginning of trial is generally considered "presumptively prejudicial." *Doggett*, 505 U.S. at 652 n.1. In the present case, the criminal complaint was filed on May 3, 1999 and the trial commenced on January 24, 2000. Although an eight-month-and-three-week delay is substantial, it is not presumptively prejudicial in a case of this seriousness and complexity.

Terry argues in his brief that "nearly 10 months is too long," but he cites only robbery cases as authority. This is not a robbery case. Rather, it is a two-defendant, eleven-count case that involves multiple allegations of attempted murder. The eight-month-and-three-week delay was not "unreasonable enough to trigger the *Barker* inquiry" under these circumstances. *Id.* (noting that a delay sufficient to constitute presumptive prejudice "[d]epend[s] on the nature of the charges"). Accordingly, we conclude that Terry's Sixth Amendment right to a speedy trial was not violated.

## G.  Miscellaneous issues

### 1.  Entrapment

Randall maintains that the district court erred when it failed to direct a verdict of acquittal for him on the basis of entrapment. An argument regarding the district court's failure to direct a verdict of acquittal for the defense of entrapment is construed as an attack on the sufficiency of the evidence. *United States v. Hamilton*, No. 92-1342, 1993 WL 118438, *6 (6th Cir. Apr. 16, 1993) (per curiam) (unpublished table decision). We therefore ask "whether, after viewing the

### d.  Count ten

Count ten charged that Randall used the mail with the intent that the murders of the Nimmos be committed in consideration for a payment of money, in violation of 18 U.S.C. § 1958(a). Terry contends that there was insufficient evidence to convict him on this count because there was no evidence that the Copes conspired to kill the Nimmos, and because the "Daddy (for your eyes only) letter" was not addressed to Terry. As explained above, however, there was ample evidence of such a conspiracy. Furthermore, the fact that the letter was not directly addressed to Terry in no way mitigates the incriminating references to Terry's involvement in the attempt to kill the Nimmos. We therefore conclude that a rational trier of fact could have found that the essential elements of the crime were proven against Randall beyond a reasonable doubt.

### 2.  Terry's conviction

Terry argues that the government did not present sufficient evidence to establish his guilt with respect to counts two, four, five, six, and nine. We will address each of his arguments in turn.

### a.  Count two

Count two charged that Terry attempted to kill Jackson by shooting at her with a .38 caliber handgun on January 22, 1999, with the intent of preventing her attendance and testimony at Randall's upcoming trial, all in violation of 18 U.S.C. § 1512(a)(1). The government needed to prove that (1) Jackson was scheduled to be a witness at an upcoming judicial proceeding against Randall, (2) Terry attempted to kill Jackson, and (3) Terry did so knowingly and wilfully with the intent to prevent the attendance or testimony of Jackson.

Terry contends that there was insufficient proof regarding the second element, namely that he attempted to kill Jackson. The testimony adduced at trial, however, showed that Terry's unaccounted for time made it possible for him to have been in

the vicinity of Jackson's home on the morning of the shooting. Moreover, the gun found in the yard of Terry's house, as well as three guns owned by the Copes' father and to which Terry had access, had general rifling characteristics that matched the bullets fired into Jackson's car. Finally, Terry met with Bill after the January 22, 1999 shooting to arrange for Bill to murder Jackson. He mentioned to Bill that Jackson's car was riddled with bullet holes and laughed that Jackson was "gun shy." These facts, together with Terry's contemporaneous involvement with his brother in an effort to rid themselves of "problem" witnesses, would permit a rational trier of fact to find that Terry attempted to murder Jackson on January 22, 1999.

### b.    Count four

Count four charged that Terry knowingly used and carried a .38 caliber handgun during and in relation to a crime of violence and, in so doing, discharging the firearm, all in violation of 18 U.S.C. § 924(c)(1)(A). Under this count, the government was required to establish that (1) Terry committed the crime alleged in count two, and (2) Terry knowingly used a firearm during and in relation to his alleged commission of that crime.

Terry's only defense to this count consisted of his argument that there was no evidence that he committed the crime alleged in count two. As discussed above, however, a rational trier of fact could have found beyond a reasonable doubt that the government had met its burden of proof regarding Terry's involvement in the attempted murder of Jackson.

### c.    Count five

Count five charged that Terry, while subject to a domestic violence protection order, knowingly and unlawfully possessed a .38 caliber handgun that was in or affected commerce, all in violation of 18 U.S.C. § 922(g)(8). The government accordingly needed to prove that (1) Terry knowingly possessed a firearm (2) at a time when he was

The court denied the motion to withdraw on June 7, 1999. Terry filed his next pretrial motion on June 11, 1999. Three nonexcludable days thus elapsed between the denial of the motion to withdraw and the filing of the next motion, bringing the total nonexcludable days to 21.

The government contends that there were no more nonexcludable days between June 11, 1999 and the first day of trial. Terry, on the other hand, argues that the time between August 23, 1999, when the magistrate judge granted Randall's motion for a competency evaluation, and October 28, 1999, when the competency-examination process was concluded, is nonexcludable time. These 66 days, however, were necessary to complete Randall's mental competency-examination process, and thus are excludable from the time calculation. *United States v. Murphy*, 241 F.3d 447, 455 (6th Cir. 2001) (excluding a lengthy time period necessary for the defendant's competency-examination process and noting that "every other circuit that has addressed the issue has concluded that time associated with mental competency examinations are excluded from the Speedy Trial clock"). Terry therefore failed to satisfy his burden of proving that the Speedy Trial Act was violated. 18 U.S.C. § 3162(a)(2) ("The defendant shall have the burden of proof of supporting such motion [to dismiss the indictment based on a violation of the Act]."); *Murphy*, 241 F.3d at 453-54 (noting that the defendant raising a Speedy Trial Act violation bears the burden of proof).

### 2.    Sixth Amendment right to speedy trial

In addition to a criminal defendant's rights under the Speedy Trial Act, the Sixth Amendment guarantees "the right to a speedy and public trial." U.S. Const. amend. VI; *see also Klopfer v. North Carolina*, 386 U.S. 213, 223 (1967) (holding that "the right to a speedy trial is as fundamental as any of the rights secured by the Sixth Amendment"). Whether there has been a violation of the constitutional right to a speedy trial is a fact-intensive inquiry requiring the balancing of "whether delay before trial was uncommonly long, whether the

the filing of the motion through the conclusion of the hearing on, or other prompt disposition of, such motion; [and] . . . delay reasonably attributable to any period, not to exceed thirty days, during which any proceeding concerning the defendant is actually under advisement by the court." 18 U.S.C. § 3161(h)(1).

Moreover, delays due to continuances granted by the court are excluded if "the ends of justice served by taking such action outweigh the best interest of the public and the defendant in a speedy trial." 18 U.S.C. § 3161(h)(8)(A). The trial court must state on the record, however, either orally or in writing, "its reasons for finding that the ends of justice served by the granting of such continuance outweigh the best interests of the public and the defendant in a speedy trial." *Id.*; *see also United States v. Crawford*, 982 F.2d 199, 204 (6th Cir. 1993) (dismissing the indictment because the trial court did not state on the record its "ends-of-justice" reasoning).

Where, as is the case at bar, multiple defendants are charged together and no severance has been granted, one speedy trial clock governs. 18 U.S.C. § 3161(h)(7). As such, the excludable delay of one defendant is ascribed to that of all of his codefendants. *United States v. Culpepper*, 898 F.2d 65, 66-67 (6th Cir. 1990).

The government admits that the Speedy Trial Act clock started to run following Randall's arraignment on May 5, 1999. Randall's first pretrial motion was filed on May 24, 1999, when his attorney filed a motion to withdraw. Thus, by May 24, 1999, 18 nonexcludable days elapsed. *See United States v. Yunis*, 723 F.2d 795, 797 (11th Cir. 1984) (interpreting 18 U.S.C. § 3161(h)(1)(F) to mean that "both the date on which an event occurs or a motion is filed and the date on which the court disposes of a motion are excluded"); *see also United States v. Mentz*, 840 F.2d 315, 326 (6th Cir. 1988) (citing *Yunis* and explaining that "the day of the indictment is excluded" from the 70-day time period).

subject to a domestic violence protection order, and that (3) the firearm was "in or affecting commerce."

Terry's only new argument concerning the sufficiency of the evidence offered to prove count five is that there was no proof that the firearm used in the January 22, 1999 shooting was "in or affecting commerce." This point is relevant because § 922(g)(8) "ensures [that] only those activities affecting interstate commerce fall within its scope." *United States v. Baker*, 197 F.3d 211, 218 (6th Cir. 1999) (holding that this nexus between the prohibited conduct under § 922(g)(8) and interstate commerce provides the necessary connection to Congress's Commerce Clause authority).

Although the government could not identify which particular gun was used in the shooting, its theory was that Terry traveled with a gun from his home in Tennessee to Jackson's home in Kentucky in order to carry out the shooting. The jury accepted the government's argument, which is sufficient to satisfy the "in-or-affecting-commerce" element. *See United States v. Faasse*, 265 F.3d 475, 488 (6th Cir. 2001) (en banc) (commenting that § 922(g)(8)'s federal jurisdiction element is satisfied when a firearm has "traveled interstate"). Accordingly, there was sufficient evidence for a rational factfinder to conclude beyond a reasonable doubt that Terry committed the crime alleged in count five.

### d.   Count six

Count six charged that Terry transported in interstate commerce a .38 caliber handgun while under indictment for a felony, in violation of 18 U.S.C. § 922(n). The government accordingly needed to prove that (1) Terry knowingly possessed a firearm, (2) the firearm was shipped or otherwise transported in interstate commerce, and (3) Terry was under indictment for a crime punishable by imprisonment for a term exceeding one year before he possessed the firearm.

Terry conceded that he was under indictment for a felony as alleged in the third element, so that his only arguments about the sufficiency of the evidence as to count six are the same as

his contentions about the sufficiency of the evidence for count five. For the reasons articulated above, we therefore conclude that there was sufficient evidence to convict Terry on count six.

### e.  Count nine

Count nine charged that Terry knowingly and voluntarily conspired to use the mail with the intent that the murders of the Nimmos be committed, in violation of 18 U.S.C. § 1958(a).  The government was required to prove that (1) Terry conspired to use the mail with the intent that the murders of the Nimmos be committed in consideration of money to be paid a contract killer, (2) Terry knowingly and voluntarily joined the conspiracy, and (3) a member of the conspiracy—either Randall or Terry—did one of the overt acts described in paragraphs 31 to 33 of the indictment to advance or help the conspiracy.

Terry argues that there was insufficient evidence to convict him on count nine because (1) the mail exchanged between Randall and him did not cross state lines, and (2) there was no evidence that linked Terry to the plot to murder the Nimmos.

### 1.    *No* interstate *mail requirement*

The murder-for-hire statute requires that the actor "use the mail *or* any facility in interstate or foreign commerce, with intent that a murder be committed." *Id.* (emphasis added).  A challenge to the lack of proof regarding the interstate commerce element is deemed to be a sufficiency-of-the-evidence argument, not a contention about the absence of subject matter jurisdiction. *United States v. Riddle*, 249 F.3d 529, 536 (6th Cir. 2001).

Although Terry maintains that the government's evidence was insufficient because it did not prove that Randall's letters crossed an interstate boundary, § 1958(a) does not require an *interstate* mailing.  The statute speaks of "us[ing] the mail or any facility in interstate or foreign commerce."  "[I]n interstate or foreign commerce" modifies "facility" and not

that the probative value of leaving the guns on display during the trial was substantially outweighed by their unfair prejudicial effect, especially since photographs of the guns were also admitted into evidence.  Because the jury had the benefit of seeing both the guns and the photographs, we can discern no reason to continuously display the guns before the jury for such a prolonged period of time.  The Copes have not shown, however, that the extended display of the guns affected their substantial rights.  Accordingly, we conclude that the district court's abuse of discretion, if any, was harmless. *Gibson*, 271 F.3d at 254.

### F.  Speedy trial

We will now address Terry's argument that the district court erred by denying his motion to dismiss the indictment for an alleged violation of (1) the Speedy Trial Act, 18 U.S.C. §§ 3161-74, and (2) his Sixth Amendment right to a speedy trial.

### 1.    *Speedy Trial Act*

This court in the past has applied two conflicting standards of review to Speedy Trial Act claims—de novo and abuse of discretion. *United States v. Murphy*, 241 F.3d 447, 453 (6th Cir.), *cert. denied*, 532 U.S. 1044 (2001).  We need not decide which standard of review is more appropriate in the present case, however, because we conclude that the district court did not err under either standard.

The Act mandates that "that a defendant be brought to trial within seventy days from the date of arrest, the filing of the indictment or information, or the first appearance before the court, whichever is later."  18 U.S.C. § 3161(c).  An indictment must be dismissed if a criminal defendant is not tried within the time allowed by the Act.  18 U.S.C. § 3162(a)(2).  The Act, however, contains numerous provisions permitting the tolling of the 70-day period, including "delay resulting from any proceeding, including any examinations, to determine the mental competency . . . of the defendant; . . . delay resulting from any pretrial motion, from

father's house and of one gun from Terry's yard. We will not reverse a district court's decision concerning the admission of evidence unless the ruling constitutes an abuse of discretion. *Gibson v. United States*, 271 F.3d 247, 254 (6th Cir. 2001). "In reviewing the trial court's decision for an abuse of discretion, the appellate court must view the evidence in the light most favorable to its proponent, giving the evidence its maximum reasonable probative force and its minimum reasonable prejudicial value." *Black v. Ryder/P.I.E. Nationwide, Inc.*, 15 F.3d 573, 587 (6th Cir. 1994) (internal quotation marks omitted). Moreover, "[e]ven if the trial court abuses its discretion, a new trial is not required unless 'substantial rights' of a party are affected." *Id.* An erroneous admission of evidence that does not affect the "substantial rights" of a party is considered harmless, and should be disregarded. *Gibson*, 271 F.3d at 254.

"To be relevant, evidence need have some bearing on the probability of 'the existence of any fact that is of consequence to the determination of the action.'" *Black*, 15 F.3d at 587 (quoting Fed. R. Evid. 401). The Copes contend that the guns that were admitted into evidence "have nothing to do with the crime charged." We disagree. Although the government could not identify with certainty the gun that was used in the January 22, 1999 shooting, this proof showed that Terry had access to the type of gun used in the shooting. On balance, we are of the opinion that the district court did not abuse its discretion in ruling that the guns' probative value was not substantially outweighed by their prejudicial effect. *See* Fed. R. Evid. 403 ("[E]vidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice.").

A closer issue is presented as to whether the district court abused its discretion in leaving the guns on display during the trial. As stated above, there was no direct evidence proving that any one of these particular guns was used in the January 22, 1999 shooting. The government's ballistics expert testified that any of 50 to 100 million guns could have been used. A reasonable argument could therefore be made

"mail." *United States v. Marek*, 238 F.3d 310, 316 (5th Cir. 2001) ("The key question of statutory construction . . . is whether . . . the phrase 'in interstate or foreign commerce' modifies 'use' or modifies 'facility.' . . . [W]e must conclude that 'in interstate or foreign commerce' is an adjective phrase that modifies 'facility,' the noun that immediately precedes it–*not* an adverbial phrase that modifies the syntactically more remote verb, '[to] use.'") (emphasis in original). As a matter of statutory construction, we agree with the Fifth Circuit's analysis.

The statute also presumes that the mail is *a priori* federal in nature, an assumption that is buttressed by the fact that the United States Postal Service is a distinctly federal entity ordained by the United States Constitution. U.S. Const. art. I, § 8, cl. 7 ("The Congress shall have Power . . . To establish Post Offices and post Roads."). We therefore conclude that § 1958(a) does not require that the government prove that items mailed through the United States Postal Service cross state boundaries. Although Terry argues that *United States v. Weathers*, 169 F.3d 336 (6th Cir. 1999), implies otherwise, we note that *Weathers* does not interpret the word "mail," but rather the phrase "facility in interstate or foreign commerce," and is thus inapposite here. 169 F.3d at 339-43 (holding that the defendants' cellular telephone calls utilized facilities in interstate commerce only because their search signals crossed state boundaries).

### 2. *The evidence linked Terry to the plot to murder the Nimmos*

The evidence detailed in Part II.A.1.c. above regarding Randall's involvement in the plot to murder the Nimmos—except for Randall's statement to Shirley Sheppard, which was admitted only as to Randall—sufficiently implicates Terry in the conspiracy. We therefore conclude that a rational juror could have found that the government's proof against Terry regarding all of the elements as to count nine were established beyond a reasonable doubt.

**B. Sixth Amendment challenge**

Randall maintains that the introduction of evidence obtained from jail cellmates turned government informants violated his Sixth Amendment rights. He argues that his Sixth Amendment right to counsel attached as of January 26, 1999, the date of his arraignment hearing on the internet harassment and credit card fraud charges. Randall therefore contends that his incriminating conversations after that date should have been suppressed. The district court denied Randall's motion to suppress. We apply the "clearly erroneous" standard to the district court's factual findings and review its legal conclusions de novo. *United States v. Van Shutters*, 163 F.3d 331, 336 (6th Cir. 1998).

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." U.S. Const. amend. VI. Statements elicited in violation of one's Sixth Amendment right to counsel must be suppressed. *Massiah v. United States*, 377 U.S. 201, 207 (1964). But "[t]he Sixth Amendment right [to counsel] . . . is offense specific. It cannot be invoked once for all future prosecutions, for it does not attach until a prosecution is commenced, that is, at or after the initiation of adversary judicial criminal proceedings—whether by way of formal charge, preliminary hearing, indictment, information, or arraignment." *McNeil v. Wisconsin*, 501 U.S. 171, 175 (1991) (internal quotation marks omitted).

The legal principle set forth by the Supreme Court in *McNeil* was recently applied by this court in *United States v. Ford*, 176 F.3d 376 (6th Cir. 1999), where the court noted that

the fact that law enforcement officials arranged for an informant to converse with an indicted defendant about offenses other than those for which the defendant had been indicted is not unlawful. Thus, if an informant "deliberately elicits" incriminating statements relating to the charged offense, the defendant is entitled to

*Shutters*, 163 F.3d at 335 ("The government has the burden of demonstrating that consent was 'freely and voluntarily given,' and was not the result of coercion, duress, or submission to a claim of authority.") (quoting *Bumper v. North Carolina*, 391 U.S. 543, 548 (1968)). We see no need not decide the issue of consent, however, because the search was clearly valid under the automobile exception. Under this exception, "in cases where there was probable cause to search a vehicle[,] a search is not unreasonable if based on facts that would justify the issuance of a warrant, even though a warrant has not been actually obtained." *Maryland v. Dyson*, 527 U.S. 465, 467 (1999) (emphasis omitted).

The automobile exception is applicable even in nonexigent circumstances, so long as the vehicle is mobile and law enforcement officers have probable cause to believe that it contains incriminating evidence. *Id.* at 466-67. "The test for 'probable cause' is simply whether there is a fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. Lumpkin*, 159 F.3d 983, 986 (6th Cir. 1998) (internal quotation marks omitted). We review de novo the district court's finding of probable cause for purposes of the automobile exception. *Ornelas v. United States*, 517 U.S. 690, 700 (1996).

The police had probable cause to believe that Terry's truck contained evidence of a crime. They knew that Terry had driven his truck to meet with Bill, at which point he paid Bill $2,500 to kill Jackson. During the meeting, Terry also told Bill that he was considering whether to arrange for other murders. There was a fair probability that other incriminating evidence—for example, another envelope with more money, or letters providing insight into Terry's murderous plots—would be found in the truck. Under these circumstances, the district court did not err in denying Terry's motion to suppress.

**E. Admission of guns**

Both Randall and Terry appeal the district court's admission into evidence of three guns recovered from their

### 1.    *Randall's letters*

The district court found that the magistrate judge had probable cause to issue search warrants to search for and seize Randall's letters to his family. When reviewing the magistrate judge's decision to issue a search warrant, we must determine "whether the magistrate had a substantial basis for finding that the affidavit established probable cause to believe that the evidence would be found at the place cited." *United States v. Davidson*, 936 F.2d 856, 859 (6th Cir. 1991).

Affidavits submitted by law enforcement officers provided the magistrate judge with a substantial basis for finding probable cause to believe that Randall's letters would contain information about the January 22, 1999 shooting. The affidavits explained, among other things, the tumultuous relationship between Randall and Jackson, Randall's harassing Jackson, Jackson's belief that Randall played a role in the January 22, 1999 shooting, Randall's statements that he desired to kill his ex-wife, and Randall's incriminating statements contained in the four letters written to family members from the jail in which he was incarcerated. We therefore conclude that the district court did not err when it denied Randall's suppression motion.

### 2.    *Terry's truck*

"[A] search conducted without a warrant issued upon probable cause is per se unreasonable, . . . subject only to a few specifically-established and well-delineated exceptions." *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973) (internal quotation marks omitted). Although the officers did not obtain a warrant to search Terry's truck, the district court found that the search was valid pursuant to three exceptions to the warrant requirement: Terry's consent, the automobile exception, and a search incident to Terry's arrest.

Terry's "consent" was allegedly given while being interrogated by law enforcement officers. Whether permission to search was freely given or was the result of coercion or duress presents a close question. *See Von*

suppression of those statements in the trial on the charged offense, but the Sixth Amendment raises no bar to the initiation of the interview itself or to the use of any statements that incriminate the defendant on uncharged offenses.

*Id.* at 380 (internal citation omitted).

Randall argues that judicial proceedings against him regarding the present charges commenced on January 26, 1999. But the hearing that took place on January 26, 1999 concerned different criminal charges against Randall, namely the internet harassment and credit card fraud charges. Although the investigation of Randall regarding the January 22, 1999 shooting was discussed at the January 26, 1999 hearing, official judicial proceedings regarding the current charges did not commence until several months later. By that time Randall had already made the incriminating statements in question. Because Randall's Sixth Amendment rights did not attach until after his last relevant conversation with the government informants, the district court did not err in denying Randall's motion to suppress his statements made to them.

### C.    Fifth Amendment and the ABA Code of Professional Responsibility challenges

Randall's next contention is that the introduction into evidence of his incriminating statements made to the confidential informants violated his Fifth Amendment rights, and that the government's working with confidential informants to elicit incriminating information at a time when he was represented by an attorney violated DR 7-104(A)(1) of the American Bar Association's Code of Professional Responsibility. Because Randall raises these issues for the first time on appeal, he must meet the "plain error" standard of review in order to prevail. *United States v. Modena*, 302 F.3d 626, 630 (6th Cir. 2002) (requiring that the error be obvious, affect the substantial rights of the defendant, and seriously impact the fairness, integrity, or public reputation of the judicial proceedings).

### 1.    *Fifth Amendment*

The Fifth Amendment provides criminal defendants with a right against self-incrimination. U.S. Const. amend. V ("No person . . . shall be compelled in any criminal case to be a witness against himself."). Fifth Amendment rights, unlike a defendant's Sixth Amendment rights, are not offense specific. *Arizona v. Robertson*, 486 U.S. 675, 682 (1988). In *Miranda v. Arizona*, 384 U.S. 436 (1966), the Supreme Court held that once an individual in custody invokes his or her Fifth Amendment right to counsel, "the interrogation must cease until an attorney is present," and the defendant must "have [counsel] present during any subsequent questioning" in the absence of a knowing and voluntary waiver of the right to counsel. 384 U.S. at 474; *see also Edwards v. Arizona*, 451 U.S. 477, 485 (1981) (holding that it was unconstitutional "to reinterrogate an accused in custody if he has clearly asserted his right to counsel").

The Fifth Amendment protection against self-incrimination, however, does not apply to noncoercive conversations with undercover informants. In *Illinois v. Perkins*, 496 U.S. 292 (1990), the Supreme Court held that an undercover law enforcement officer posing as a fellow inmate need not give *Miranda* warnings to an incarcerated suspect before eliciting incriminating information. *Id.* at 296-98. The *Perkins* Court explained that speaking with undercover government informants while incarcerated does not create a coercive atmosphere, and thus does not implicate the Self-Incrimination Clause of the Fifth Amendment. *Id.* at 298. Because Randall's Fifth Amendment rights against self-incrimination did not apply when he talked with the confidential government informants, the district court did not commit any error, much less plain error, when it admitted the incriminating statements that Randall made to them.

### 2.    *ABA Code of Professional Responsibility*

Randall also claims that the government's working with confidential informants who engaged in conversations with

Randall violated DR 7-104. This Disciplinary Rule provides in pertinent part as follows:

> During the course of his representation of a client a lawyer shall not . . . [c]ommunicate or cause another to communicate on the subject to the representation with a party he knows to be represented by a lawyer in that matter unless he has the prior consent of the lawyer representing such other party or is authorized by law to do so.

Randall has cited no authority, nor have we found any, to support his contention that the government's working with confidential informants to elicit incriminating information from a represented defendant violates DR 7-104. *Cf. United States v. Heinz*, 983 F.2d 609, 618 (5th Cir. 1993) ("The use of informants to gather evidence against a suspect will generally, if not almost always, fall within the ambit of the 'authorized by law' exception to DR 7-104.") (emphasis omitted). In the absence of authoritative support, and after taking into account that the Supreme Court has allowed such informant testimony, *Perkins*, 496 U.S. at 296-98, we are unable to conclude that plain error occurred in allowing the testimony in question.

### D.    Fourth Amendment challenges

We now turn to the Copes' challenges based on the Fourth Amendment, which protects "the right of the people to be secure in their persons . . . against unreasonable searches and seizures." U.S. Const. amend. IV. Randall appeals the denial of his suppression motion regarding the admission into evidence of letters that he wrote to his family. Terry appeals the denial of his suppression motion regarding the admission into evidence of items seized during the search of his truck. In reviewing a district court's ruling on a motion to suppress, we will affirm the court's findings of fact unless they are clearly erroneous, and will review de novo the court's conclusions of law. *United States v. Von Shutters*, 163 F.3d 331, 336 (6th Cir. 1998).