**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 16a0443n.06

No. 15-2248

**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

**FILED**
Aug 02, 2016
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| **Plaintiff-Appellee,** | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| v. | ) | COURT FOR THE EASTERN |
| | ) | DISTRICT OF MICHIGAN |
| IRVIN FLEMMING, | ) | |
| | ) | **OPINION** |
| **Defendant-Appellant.** | ) | |
| | ) | |

Before: GUY, BOGGS, and MOORE, Circuit Judges.

**KAREN NELSON MOORE, Circuit Judge.** In September and October 2010, Irvin Flemming ("Flemming") and his wife, Jacqueline Flemming ("Jacqueline"), deposited $230,824 in cash into five different bank accounts. They obtained the money from Carlos Powell, who at the time led a large narcotics-trafficking ring. All told, the Flemmings made thirty-six cash deposits, none of which exceeded $10,000. In 2013, a grand jury indicted Flemming (but not Jacqueline) for structuring financial transactions in violation of 31 U.S.C. § 5324, and aiding and abetting the same. A jury convicted Flemming of the structuring count, and the district court sentenced him to twenty-four months in prison.

Flemming represented himself at trial; he does so again before us, raising several challenges on appeal. For the reasons set forth below, we **AFFIRM** Flemming's conviction and sentence.

## I. FACTS AND PROCEDURAL HISTORY

The facts of Flemming's offense conduct are straightforward: in September and October 2010, Flemming made—or directed Jacqueline to make—thirty-six structured deposits of Powell's cash. The procedural history of Flemming's case, however, is labyrinthine. Flemming proceeded pro se in the district court and filed many motions before, during, and after his March 2015 trial. We provide an abbreviated account of Flemming's case below.

### A. Facts

This case arises out of one of the largest drug-trafficking prosecutions in the history of Detroit, Michigan. Powell ran a narcotics conspiracy that was based in Detroit and spanned several states.[1] R. 541 (Trial Tr. (Donovan) at 30–42) (Page ID #5784–96). The conspiracy proved very profitable: before federal authorities shut down his operation, Powell and his associates made millions of dollars in cash. *Id.* at 37 (Page ID #5791).

Powell laundered much of that cash—this is how Flemming came to play a role in Powell's criminal enterprise. In 2010, Flemming's business associate, Tom Conley, introduced Flemming to Powell. R. 543 (Trial Tr. (Conley) at 26–27, 41) (Page ID #6172–73, 6187). At the time, Flemming was buying and selling cars through Covenant Cars, a dealership that Conley owned. *Id.* at 28–29 (Page ID #6174–75). Powell sought to purchase a new car, and Flemming agreed to help him. *Id.* at 27 (Page ID #6173). Between August and October 2010, Flemming sold to Powell—or purchased on Powell's behalf—several vehicles and a condominium in

---

[1]Powell is currently serving a life sentence of imprisonment; his appeal is pending before this court. *See* Docket, *United States v. Powell*, No. 14-2506.

Atlanta, Georgia.  R. 542 (Trial Tr. (Andrade) at 121) (Page ID #6062); R. 543 (Trial Tr. (Boudreau) at 119, 124, 129–31, 143) (Page ID #6265, 6270, 6275–77, 6289).

Powell gave Flemming cash to complete those transactions.  R. 543 (Trial Tr. (Boudreau) at 147–49) (Page ID #6293–95).  Flemming deposited Powell's cash into five different bank accounts.  R. 576-2 (Government's Sentencing Mem., Ex. 1 (Tr. Ex. 86A)—Summary of Cash Deposits ("Summary")) (Page ID #7589).  None of the accounts bore Flemming's name:  two were in Jacqueline's name, two were in Flemming's mother's name (Corinne Flemming), and one was in the name of a business, iDimension, Inc.  R. 542 (Trial Tr. (Bell) at 6, 16, 20) (Page ID #5947, 5957, 5961).  Before meeting Powell, Flemming had never made a deposit larger than $1,000 into any of those accounts.  R. 543 (Trial Tr. (Boudreau) at 122) (Page ID #6268).  Between September 16 and October 25, however, the Flemmings made thirty-six deposits totaling $230,824.  R. 576-2 (Summary) (Page ID #7589).  *All* of those deposits exceeded $1,000, but *none* exceeded $10,000.  *Id.*

On November 17, 2010, law-enforcement authorities executed search warrants at several locations associated with Powell's enterprise.  R. 541 (Trial Tr. (Donovan) at 32–34) (Page ID #5786–88).  They recovered millions of dollars in cash and large quantities of narcotics.  *Id.* at 37 (Page ID #5791).  At the time of the searches, Powell and Flemming were together in Flemming's Troy, Michigan condominium.  R. 543 (Trial Tr. (Boudreau) at 150) (Page ID #6296).

## B. Procedural History

On February 1, 2012, a grand jury in the Eastern District of Michigan indicted Powell and eleven co-defendants—but not Flemming—for an array of narcotics-related offenses. R. 3 (Indictment) (Page ID #7). Flemming was later named as one of Powell's co-defendants in a superseding indictment dated January 15, 2013. R. 171 (Superseding Indictment) (Page ID #1288). The superseding indictment charged Flemming with structuring financial transactions in violation of 31 U.S.C. § 5324, and aiding and abetting the same. *Id.* at 22 (Page ID #1309).

Flemming was arraigned on January 31, and he entered a plea of not guilty. 1/31/13 Min. Entry. On November 1, 2013, the district court allowed Flemming to represent himself pro se and appointed standby counsel to assist him. R. 220 (11/01/13 Order) (Page ID #1703).

Between February and August 2014, Flemming filed seventeen pretrial motions. R. 406 (Order Adjourning Dates at 1) (Page ID #3024). We focus on one here: Flemming's July 21, 2014 motion to dismiss the superseding indictment, in which Flemming argued that the government's delay in trying him violated the Speedy Trial Act of 1974. R. 394 (7/21/14 Mot. to Dismiss) (Page ID #2945). Flemming amended that motion twice—once on July 28, and again on August 8. R. 397 (Amendment to Mot. to Dismiss) (Page ID #2973); R. 405 (Adding Additional Days and Notes to Mot. to Dismiss) (Page ID #3012).

On September 8, 2014, the district court denied Flemming's seventeen motions— including his Speedy Trial Act motion—in five separate written orders. R. 422 (Order Denying Mots. for Discovery) (Page ID #3082); R. 423 (Order Denying Mot. for Bill of Particulars) (Page

4

ID #3091); R. 424 (Order Denying Mots. to Dismiss or for Discovery for Selective or Vindictive Prosecution) (Page ID #3098); R. 425 (Order Denying Mots. to Dismiss for Speedy Trial Act Violations) (Page ID #3105); R. 426 (Order Denying Mot. for Withdrawal of Attorney) (Page ID #3110).

In dismissing Flemming's Speedy Trial Act motion, the district court explained that it had entered several orders for excludable delay—on September 16, 2012; February 4, 2013; June 6, 2013; and August 8, 2014. R. 425 (Order Denying Mots. to Dismiss for Speedy Trial Act Violations at 3–4 & n.1) (Page ID #3107–08). Moreover, Flemming had filed a litany of motions that also tolled his speedy-trial clock. *Id.* at 4 (Page ID #3108). Those motions, along with the district court's excludable-delay orders, had the combined effect of freezing Flemming's speedy-trial clock from the day he was indicted through the day the district court issued its September 8, 2014 order denying Flemming's motion to dismiss. *Id.* at 5 (Page ID #3109).

On April 2, 2014, the district court severed Flemming's case from the cases of the other defendants named in the superseding indictment. R. 256 (Order of Severance at 3) (Page ID #1990). Flemming's trial began on March 17, 2015. R. 487 (1/21/15 Order at 2) (Page ID #4113).

Pursuant to an immunity agreement with the government, Jacqueline testified against Flemming. R. 543 (Trial Tr. (J. Flemming) at 51, 54) (Page ID #6197, 6200). Jacqueline admitted that in the fall of 2010, she made large cash deposits with money that Flemming had given her. *Id.* at 58–59 (Page ID #6204–05). At the time of the deposits, Jacqueline and

Flemming were married and living together; they separated in November 2010, but did not divorce. *Id.* at 51 (Page ID #6197).

During the course of her direct examination, Jacqueline recounted three statements that she had made to Flemming during the course of their marriage:

1. Towards the beginning of her testimony, Jacqueline stated that she had worked as a bank teller in the early 1990s. *Id.* at 56 (Page ID #6202). Jacqueline and the prosecutor questioning her had the following exchange:

> Q. Did you ever talk to Mr. Flemming in 2010 about the $10,000 limit for cash deposits?
>
> A. Yes.
>
> Q. And what did you—what did you tell him?
>
> A. I told him in—from what I can recall that there's paperwork that needs to be filled out if a deposit is made in cash of more than $10,000.
>
> Q. And did you know that based on your prior work as a bank teller?
>
> A. I did recall that from my training as a teller.

*Id.* at 57 (Page ID #6203). Flemming did not object to this testimony.

2. Jacqueline also recounted an incident that occurred in October 2010. As Jacqueline exited a bank where she had deposited Flemming's cash, a bank manager approached Jacqueline and asked her if she was structuring deposits. *Id.* at 79–80 (Page ID #6225–26). At the time, Jacqueline did not know what "structuring" was; the manager responded that Jacqueline should have been "filling out . . . paperwork for deposits." *Id.* at 80 (Page ID #6226). The manager did

not tell Jacqueline whether there was a threshold for deposits that require paperwork; nor did the manager tell Jacqueline whether it mattered if the deposits were in the form of cash or checks. *Id.* He did, however, tell Jacqueline not to "do it again." *Id.* Jacqueline testified that she told Flemming about this conversation at the bank. *Id.* at 80–81 (Page ID #6226–27).

The district court interrupted Jacqueline, concerned that her testimony about a conversation she had with Flemming might have violated a marital privilege. *Id.* at 81 (Page ID #6227). The district court asked the government to move on, and reserved a ruling on the marital-privilege issue. *Id.* at 83 (Page ID #6229).

3. Finally, the government asked Jacqueline about a 2007 Rolls Royce that Flemming had sold to Powell, and Jacqueline testified that Flemming had told her that Powell was going to buy the car. *Id.* at 85 (Page ID #6231). Flemming objected on privilege grounds; the district court sustained his objection, and instructed the jury not to consider Jacqueline's account of her conversation with Flemming about the Rolls Royce. *Id.* at 86 (Page ID #6232).

After Jacqueline finished testifying, the district court excused the jury and asked Jacqueline about the first of these statements—when Jacqueline told Flemming that cash deposits in excess of $10,000 require paperwork. *Id.* at 88 (Page ID #6234). Jacqueline recalled that she had this conversation with Flemming sometime before June 2010. *Id.* The court heard argument about whether that conversation was protected by marital privilege and invited the parties to brief the issue. *Id.* at 89–95 (Page ID #6235–41). Only the government filed a brief. R. 523 (Gov't Br. Regarding Spousal Privilege and Marital Commc'n) (Page ID #5666).

After considering the government's brief, the district court issued an oral ruling on Jacqueline's testimony. R. 545 (Trial Tr. at 16–18) (Page ID #6484–86). It held that Jacqueline's testimony concerning her conversation with Flemming about the $10,000 reporting requirement did not violate *spousal* privilege. *Id.* at 16 (Page ID #6484). However, the court found that that testimony violated a related privilege—the *marital-communications* privilege— but that the government had a good-faith basis for eliciting it. *Id.* at 17–18 (Page ID #6485–86). Later, the district court struck this testimony and gave the jury a curative instruction, telling them to disregard Jacqueline's testimony about that conversation with Flemming. *Id.* at 69 (Page ID #6537).

On December 9, 2013, Flemming entered into a *Kastigar* immunity agreement with the government. R. 525 (3/23/15 Gov't Resp. at 3–4) (Page ID #5681–82). Pursuant to that agreement, Flemming proffered information to the government, and the government reserved the right to "make derivative use of" that information. *Id.* at 5 (Page ID #5683). As relevant here, during his proffer session, Flemming discussed a 2007 Bentley that he had purchased on October 14, 2010. *Id.* at 4–5 (Page ID #5682–83).

At Flemming's trial, the government introduced Kevin Boudreau, a private investigator who helped the U.S. Attorney's Office investigate Flemming. R. 543 (Trial Tr. (Boudreau) at 115) (Page ID #6261). Boudreau discussed the 2007 Bentley, and, without identifying Flemming as the purchaser, testified that the car "was initially going to be purchased for an

8

associate of Carlos Powell, guy by the name of LA." *Id.* at 141, 143–44 (Page ID #6287, 6289–90).

Although Flemming did not object to Boudreau's testimony at trial, he later filed a motion to dismiss his case, arguing that the government violated his *Kastigar* agreement by eliciting testimony from Boudreau about the 2007 Bentley and "LA." R. 524 (3/23/15 Def.'s Mot. to Dismiss at 1–2) (Page ID #5677–78). The government filed a response in which it explained that, through its own investigation, it learned about the Bentley and LA before Flemming's proffer session, and thus did not violate the *Kastigar* agreement when it introduced testimony about the car and its intended recipient. R. 525 (3/23/15 Gov't Resp. at 4–6) (Page ID #5682–84). The district court sided with the government, calling the *Kastigar* issue "a red herring" and ruling that the government had not violated Flemming's *Kastigar* agreement. R. 545 (Trial Tr. at 13–14) (Page ID #6481–82).

Flemming's jury found Flemming guilty of structuring, and did not consider the related aiding-and-abetting count. R. 546 (Trial Tr. at 115) (Page ID #6798). Flemming filed motions for acquittal and a new trial, which the district court denied. R. 583 (9/3/15 Order) (Page ID #8991).

Before sentencing, Flemming filed a memorandum in which he argued that he was entitled to receive a Base Offense Level of six under U.S.S.G. § 2S1.3(b)(3)'s "safe harbor reduction." R. 573 (Def. Flemming's Sentencing Mem. at 19–21) (Page ID #7508–10). In support of his request, Flemming claimed that he did not know that Powell was a criminal, and

thus that he was unaware that the cash he received from Powell came from illicit activities. *Id.* at 20–21 (Page ID #7509–10).

The district court rejected Flemming's safe-harbor argument, reasoning that "he could have or should have known what . . . Powell was up to." R. 598 (Sentencing Tr. at 12) (Page ID #9489). Flemming faced a guidelines range of twenty-seven to thirty-three months in prison; the district court varied downward, sentencing Flemming to twenty-four months. *Id.* at 48 (Page ID #9525). Flemming timely appealed. R. 593 (Notice of Appeal) (Page ID #9410).

## II. ANALYSIS

Flemming raises several challenges to his conviction and sentence, many of which have multiple sub-arguments. Before addressing those challenges on the merits, we emphasize two points. First, because Flemming is proceeding pro se, "we are mindful to construe his arguments liberally." *El Bey v. Roop*, 530 F.3d 407, 413 (6th Cir. 2008). Second, even though Flemming's arguments are entitled to that liberal construction, we still "deem[] waived" any arguments that Flemming raises in cursory, perfunctory fashion. *Geboy v. Brigano*, 489 F.3d 752, 767 (6th Cir. 2007) (citations omitted).

With these principles in mind, we read Flemming's briefs as raising five distinct arguments. All are unavailing. Flemming argues first that the district court violated his rights under the Speedy Trial Act by continuing his trial until March 17, 2015. Second, he argues that the district court erred when it allowed Jacqueline to testify about the conversation she had with Flemming about the cash-transaction reporting requirement. Third, Flemming argues that

Boudreau's testimony about the Bentley and LA violated Flemming's *Kastigar* agreement. Fourth, Flemming contends that the government violated its discovery obligations under *Brady v. Maryland*, 373 U.S. 83 (1963), by withholding records of Manheim Auto Auctions. Finally, Flemming contends that he was entitled to receive U.S.S.G. § 2S1.3(b)(3)'s safe-harbor reduction. Finding no error, we uphold Flemming's conviction and sentence.

## A. Speedy Trial Act

### 1. Standard of Review

Our review of Flemming's Speedy Trial Act claim has three parts, and each has a different standard of review. To begin, we review de novo "the district court's interpretation of the Speedy Trial Act." *United States v. Sobh*, 571 F.3d 600, 602 (6th Cir. 2009). We review for clear error the district court's findings of fact regarding Flemming's speedy-trial clock. *Id.* Finally, we review for an abuse of discretion the district court's determination that "the ends of justice" merited continuances of Flemming's trial date. *United States v. Stewart*, 628 F.3d 246, 253 (6th Cir. 2010) (quoting 18 U.S.C. § 3161(h)(7)(A)).

### 2. The district court did not violate Flemming's Speedy Trial Act rights.

Flemming raises a number of speedy-trial claims, but the thrust of his argument is that he was not tried within seventy days of his arraignment, as the Speedy Trial Act commands. This argument lacks merit. The district court's excludable-delay orders, and Flemming's extensive pretrial-motion practice, had the combined effect of freezing Flemming's speedy-trial clock from

11

the date of his arraignment through the first day of his trial. There was no Speedy Trial Act violation here.

"The Speedy Trial Act . . . requires dismissal of a criminal case, with or without prejudice, if the defendant is not tried seventy days after his indictment or his first court appearance, whichever occurs later." *United States v. Gardner*, 488 F.3d 700, 717 (6th Cir. 2007). Flemming's "first court appearance"—his January 31, 2013 arraignment—postdates his indictment, so we use that date as the start of his speedy-trial clock. *Id.*

We have established a two-step burden-shifting scheme to assess claims of prosecutorial delay under the Speedy Trial Act. First, to "establish a prima facie case," a defendant must "show[] that he was not brought to trial within the seventy-day period." *Id.*

Second, if "the defendant establishes that prima facie case, the government has the burden of showing that, after taking into account time excludable from the seventy-day period, the defendant was brought to trial during the statutorily mandated period." *Id.* The Speedy Trial Act's seventy-day clock is subject to several exclusions and exceptions. *See* 18 U.S.C. § 3161(h). Three bear mention here:

1. First, in multi-defendant cases, we use one speedy-trial clock. *United States v. Cope*, 312 F.3d 757, 776 (6th Cir. 2002) ("Where . . . multiple defendants are charged together and no severance has been granted, one speedy trial clock governs."). This rule "applies equally to earlier and later arraigned codefendants." *Sobh*, 571 F.3d at 603.

2. Second, a district court may exclude from the speedy-trial clock "[a]ny period of delay resulting from a continuance granted by any judge . . . if the judge granted such continuance on the basis of his findings that the ends of justice served by taking such action outweigh the best interest of the public and the defendant in a speedy trial."  18 U.S.C. § 3161(h)(7)(A).  "[T]he [district] court must set forth, either orally or in writing, its reasons for finding that the ends of justice outweigh the best interests of the public and the defendant in a speedy trial."  *Gardner*, 488 F.3d at 718 (citing *United States v. Richmond*, 735 F.3d 208, 214 (6th Cir. 1984)).  Because we review for an abuse of discretion a district court's determination that a continuance is necessary to serve the ends of justice, a defendant challenging such a determination "must show 'actual prejudice.'"  *Stewart*, 628 F.3d at 254 (quoting *Gardner*, 488 F.3d at 718).

3. Finally, "delay resulting from any pretrial motion, from the filing of the motion through the conclusion of the hearing on, or other prompt disposition of, such motion," does not count towards the Speedy Trial Act's seventy-day clock.  18 U.S.C. § 3161(h)(1)(D).  This is true "irrespective of whether [a pretrial motion] actually causes, or is expected to cause, delay in starting a trial."  *United States v. Tinklenberg*, 563 U.S. 647, 650 (2011).

With these principles in mind, we hold that the government's delay in bringing Flemming to trial did not violate the Speedy Trial Act.  Flemming has established a prima facie Speedy Trial Act violation, because the time between the date of his arraignment (January 31, 2013) and the first day of his trial (March 17, 2015) far exceeded seventy days.  However, the government

has rebutted Flemming's prima facie case, because *all* of the days between Flemming's arraignment and his trial were excludable under the Speedy Trial Act. To explain why the government has carried its burden, we start with the district court's September 16, 2012 excludable-delay order, turn to the subsequent excludable-delay orders it entered, and finally consider the tolling effect of Flemming's extensive pretrial-motion practice:

1. *September 16, 2012 excludable-delay order*: Flemming's speedy-trial clock was *already frozen* when he was arraigned, because the district court entered its first excludable-delay order on September 16, 2012—over four months before Flemming's arraignment. R. 141 (9/16/12 Order at 1) (Page ID #1041). That order deemed excludable "the time period between January 11, 2013 and June 17, 2013," and included the district court's finding that excluding this period would serve "the ends of justice." *Id.*

It is of no moment that Flemming had not yet been arraigned on September 16, 2012. The January 15, 2013 superseding indictment named Flemming as a co-defendant of Powell and others to whom the September 16 excludable-delay order applied. Thus, the district court's finding of excludable delay "applie[d] equally to" Flemming as a "later arraigned codefendant[]." *Sobh*, 571 F.3d at 603. Accordingly, on the day Flemming first appeared before the district court—January 31, 2013—his speedy-trial clock was already tolled until June 17, 2013.

2. *Subsequent excludable-delay orders*: After September 16, 2012, the district court entered four excludable-delay orders that tolled Flemming's speedy-trial clock through April 29,

2014.  First, on February 4, 2013—five days after Flemming's arraignment—the district court entered an excludable-delay order because "some of [Flemming's] co-defendants were unavailable."  R. 425 (9/8/14 Order at 3) (Page ID #3107).  Three more excludable-delay orders followed:  (a) June 6, 2013 (which tolled Flemming's speedy-trial clock through November 5, 2013); (b) October 11, 2013 (which tolled his speedy-trial clock through February 25, 2014); and (c) January 20, 2014 (which tolled his speedy-trial clock through April 29, 2014).  R. 203 (6/6/13 Order at 1) (Page ID #1652); R. 214 (10/11/13 Order at 1–2) (Page ID #1695–96); R. 230 (1/20/14 Order at 1–2) (Page ID #1739–40).

All four of these excludable-delay orders predated the district court's April 2, 2014 order severing Flemming from his then-co-defendants.  R. 256 (Order of Severance) (Page ID #1988).  Because Flemming had *not* been severed before the district court entered its January 20, 2014 excludable-delay order, the time period that that order excluded—the period ending April 29, 2014—was also excluded from Flemming's speedy-trial clock.  18 U.S.C. § 3161(h)(6); *United States v. Snelling*, 961 F.2d 93, 95 (6th Cir. 1991).

One last point about these excludable-delay orders.  Flemming argues that he "was never consulted" regarding the June 6, October 11, and January 20 excludable-delay orders, and that as a result they did not toll his speedy-trial clock.  Appellant Br. at 28.  However, a district court does not need to obtain a defendant's consent before it enters an ends-of-justice continuance.  *See Sobh*, 571 F.3d at 603.  Just so here:  the district court entered its June 6, October 11, and January 20 excludable-delay orders in order to serve the ends of justice.  R. 203 (6/6/13 Order at

1) (Page ID #1652); R. 214 (10/11/13 Order at 1–2) (Page ID #1695–96); R. 230 (1/20/14 Order at 1–2) (Page ID #1739–40). Thus, even though Flemming now claims that he did not consent to those orders, they nonetheless tolled his speedy-trial clock until April 29, 2014.

3. *Flemming's pretrial motions*: Finally, Flemming filed several pretrial motions that had the cumulative effect of tolling his speedy-trial clock until the first day of his trial: March 17, 2015.

Flemming started on February 8, 2014 with a motion asking the district court to withdraw his standby counsel. R. 232 (Mot. to Withdraw Standby Counsel) (Page ID #1779). Flemming's subsequent motions are too numerous to list here. Suffice it to say, on August 8, 2014 the district court issued yet another ends-of-justice continuance order, finding that Flemming's "approximately seventeen pretrial motions" merited continuing Flemming's trial until October 28, 2014. R. 406 (Order Adjourning Dates at 1) (Page ID #3024).

The district court denied Flemming's pretrial motions on September 8, 2014. R. 422 (Order Denying Mots. for Discovery) (Page ID #3082); R. 423 (Order Denying Mot. for Bill of Particulars) (Page ID #3091); R. 424 (Order Denying Mots. to Dismiss or for Discovery for Selective or Vindictive Prosecution) (Page ID #3098); R. 425 (Order Denying Mots. to Dismiss for Speedy Trial Act Violations) (Page ID #3105); R. 426 (Order Denying Mot. for Withdrawal of Attorney) (Page ID #3110). Flemming was not finished: on September 18 and 19, he moved for reconsideration of many of the district court's September 8 orders, and also moved for a venue change. R. 431 (Mot. to Reconsider—Speedy Trial Act) (Page ID #3171); R. 433 (Mot.

16

for Reconsideration—Withdrawal) (Page ID #3230); R. 434 (Mot. for Change of Venue) (Page ID #3233); R. 435 (Mot. to Reconsider—Selective or Vindictive Prosecution) (Page ID #3282).

More motions followed. On September 23, 2014, a case manager from the district court emailed Flemming, explaining that his trial date would need to be moved so the court could begin a different criminal trial. R. 459-2 (9/23/14 Email from Carol Cohron to Irvin Flemming) (Page ID #3694). That email instructed Flemming to stipulate to a new trial date with the government. *Id.* Because Flemming was unwilling to do so, the government filed a motion to adjourn his trial, R. 455 (Mot. to Adjourn) (Page ID #3653), which Flemming opposed, R. 459 (Resp. to Gov't Mot. to Adjourn) (Page ID #3678). On January 21, 2015, the district court issued an order setting March 17, 2015 as the first date of Flemming's trial. R. 487 (1/21/15 Order at 2) (Page ID #4113). And it was not until March 18, 2015—one day after voir dire concluded—that the district court denied Flemming's motions for reconsideration and change of venue. R. 521 (3/18/15 Order at 1–2) (Page ID #5663–64).

That lengthy recitation takes us from Flemming's January 31, 2013 arraignment through the first day of his trial on March 17, 2015. The combination of excludable-delay orders and Flemming's pretrial motions had the effect of tolling Flemming's speedy-trial clock for the duration of that period. Because *every single day* between January 31, 2013 and March 17, 2015 was properly excludable under the Speedy Trial Act, we hold that the district court did not violate Flemming's Speedy Trial Act rights.

## B. Marital-Communications Privilege

### 1. Standard of Review

Flemming faults the district court for allowing Jacqueline to testify about an allegedly privileged conversation, and also for hearing oral argument about Jacqueline's testimony in front of Flemming's jury. We construe this argument as a claim that the district court erred by allowing Jacqueline to recount her conversation with Flemming about the $10,000 cash-transaction reporting requirement. We review for an abuse of discretion the district court's resolution of this privilege issue. *United States v. Morales*, 687 F.3d 697, 701–02 (6th Cir. 2012). Moreover, "reversal is appropriate only if the abuse of discretion was not harmless error, that is, only if the erroneous evidentiary ruling affected the outcome of the trial." *Id.* (quoting *United States v. Marrero*, 651 F.3d 453, 471 (6th Cir. 2011)); *see also United States v. Howton*, 260 F. App'x 813, 819 (6th Cir. 2008) (reviewing for harmless error district court's erroneous admission of letter subject to marital-communications privilege).

### 2. The district court did not abuse its discretion when it struck part of Jacqueline's testimony that arguably violated the marital-communications privilege and then gave Flemming's jury a curative instruction, and any alleged error would have been harmless.

At the outset, we think it important to review what did and did not happen during Jacqueline's direct examination. The district court did not *order* Jacqueline to testify about her conversations with Flemming. The government introduced Jacqueline as a witness, and she testified under an immunity grant. Jacqueline testified that sometime in 2010, she told Flemming

that cash deposits in excess of $10,000 require special paperwork. Outside the presence of the jury, Jacqueline stated that she and Flemming had this conversation before June 2010.

After hearing oral argument about whether Jacqueline's testimony violated a marital privilege, the district court asked the parties to brief the issue; only the government responded to the district court's invitation. After considering the government's brief, the district court issued an oral ruling—outside the presence of the jury—that Jacqueline's testimony violated the marital-communications privilege. The district court then gave Flemming's jury a curative instruction, telling them to disregard Jacqueline's privileged testimony.

This was not an abuse of discretion. Even if we were to find an error, we are confident that any error would be harmless. We address each issue in turn.

> **a. The district court did not abuse its discretion when it struck Jacqueline's testimony and then gave Flemming's jury a curative instruction.**

The district court did not abuse its discretion when it held that Jacqueline's testimony violated the marital-communications privilege, and then cured that error by instructing Flemming's jury to disregard her testimony.

"The confidential marital communications privilege excludes confidential communications made by one spouse to the other during the marriage." *United States v. Porter*, 986 F.2d 1014, 1018 (6th Cir. 1993). "There are three prerequisites to the assertion of this privilege. (1) At the time of communication there must have been a marriage recognized as valid by state law; (2) the privilege applies only to utterances or expressions intended by one spouse to convey a message to the other . . . ; and (3) the communication must be made in confidence.*" Id.*

19

(internal quotation marks and citations omitted). However, the marital-communications privilege is subject to the "joint participants exception": communications between a married couple "regarding joint ongoing or future patently illegal activity" are not privileged. *United States v. Sims*, 755 F.2d 1239, 1243 (6th Cir. 1985).

Although this is a close question, we agree with the district court that Jacqueline's conversation with Flemming about reporting cash transactions was probably privileged. Jacqueline and Flemming were married when the conversation occurred; Jacqueline discussed the cash-reporting requirement because she wanted to convey a message to Flemming; and it seems likely that Jacqueline made that communication to Flemming in confidence. *Porter*, 986 F.2d at 1018.

This conversation arguably fell within the joint-participants exception. Jacqueline may not have been indicted, but the substance of her communication with Flemming concerned an illegal activity that they *jointly* undertook: structuring cash deposits. *See Sims*, 755 F.2d at 1243. On the other hand, Jacqueline also testified—outside the presence of the jury—that she and Flemming had this conversation before June 2010; as the district court noted, "at the time [Jacqueline] made the communication" she may have been unaware "that [Flemming] was engaged in any structuring activity or criminal activity." R. 545 (Trial Tr. at 17) (Page ID #6485). In any event, we cannot say that the district court *abused its discretion* when it determined that the joint-participants exception did not apply.

More to the point, the district court did not abuse its discretion when it struck Jacqueline's testimony about her conversation with Flemming and gave Flemming's jury a curative instruction. "[P]roperly prepared curative instructions are often sufficient to cure any prejudice resulting from the jury hearing inadmissible evidence." *United States v. Blakeney*, 942 F.2d 1001, 1030 (6th Cir. 1991). Such is the case here: without drawing undue attention to Jacqueline's testimony, the district court firmly instructed Flemming's jury to disregard it. Moreover, we presume that Flemming's jury "underst[ood] and follow[ed]" that instruction. *United States v. Wiedyk*, 71 F.3d 602, 608 (6th Cir. 1995) (citation omitted).

### b. Jacqueline's testimony was harmless as to Flemming's conviction for structuring.

Even if the district court had erred by striking Jacqueline's testimony and then giving a curative instruction, any error would have been harmless.

In assessing whether admission of Jacqueline's testimony was harmless error, "[o]ur concern is not with whether there was sufficient evidence on which [the defendant] could have been convicted without the evidence complained of, but rather the question is whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction." *United States v. Bell*, 516 F.3d 432, 447 (6th Cir. 2008) (internal quotation marks and citation omitted). As relevant here, "a curative instruction by the trial court [also] occasionally renders harmless the erroneous admission of prejudicial evidence." *Id.* (internal quotation marks and citation omitted).

Accordingly, we begin our harmless-error inquiry by looking to the elements of the crime of structuring, and then determine the extent to which Jacqueline's testimony affected the jury's consideration of those elements. Because "[f]ederal law requires banks and other financial institutions to file reports with the Secretary of the Treasury whenever they are involved in a cash transaction that exceeds $10,000[,] . . . [i]t is illegal to 'structure' transactions—*i.e.,* to break up a single transaction above the reporting threshold into two or more separate transactions—for the purpose of evading a financial institution's reporting requirement." *Ratzlaf v. United States*, 510 U.S. 135, 136 (1994) (internal citations omitted). To secure a defendant's conviction for structuring under 31 U.S.C. § 5324, the government must establish three elements:

> (1) [T]he defendant must, in fact, have engaged in acts of structuring; (2) he must have done so with knowledge that the financial institutions involved were legally obligated to report currency transactions in excess of $10,000; and (3) he must have acted with the intent to evade this reporting requirement.

*United States v. Sutton*, 387 F. App'x 595, 599 (6th Cir. 2010) (citation omitted).

Jacqueline's challenged testimony goes to the second of these elements. Jacqueline testified that she told Flemming that banks are required to report cash deposits above $10,000. As the government concedes, that testimony "could have shown Flemming's direct knowledge of the reporting requirement." Appellee Br. at 34.

However, we are confident that any error in allowing Jacqueline to recount her conversation with Flemming was harmless. There was *ample* evidence apart from Jacqueline's stray comment that established Flemming's knowledge of the reporting requirement. In particular, the government introduced a chart detailing all of the sub-$10,000 deposits that

Flemming and Jacqueline made in September and October 2010. R. 576-2 (Summary) (Page ID #7589). Flemming and Jacqueline made thirty-six deposits into five different accounts, and *none* of those deposits exceeded $10,000.

Flemming's jury, we think, could have easily drawn two clear inferences from this chart. First, Flemming *knew* that cash deposits above $10,000 needed to be reported. Second, Flemming structured his deposits to avoid that reporting requirement. Put simply, Flemming's pattern of cash deposits spoke for itself.

In sum, although we do not believe that the district court abused its discretion when it struck Jacqueline's testimony and gave Flemming's jury a curative instruction, we are nonetheless confident that any error in simply providing a curative instruction rather than ordering a more aggressive action such as a mistrial would have been harmless as to Flemming's conviction for structuring.

## C. *Kastigar* Agreement

### 1. Standard of Review

We review for clear error the district court's determination that the government's introduction of trial testimony did not breach Flemming's *Kastigar* immunity agreement. *United States v. Fitch*, 964 F.2d 571, 574 (6th Cir. 1992).

### 2. The government's introduction of testimony about the 2007 Bentley did not violate Flemming's *Kastigar* agreement.

Flemming argues that the government breached his *Kastigar* immunity agreement when it introduced testimony from Boudreau about a 2007 Bentley that Flemming purchased for "LA,"

one of Powell's associates.  The government, Flemming avers, learned about the Bentley and LA *only because* Flemming discussed the vehicle during his proffer session.  Flemming is incorrect: the government learned about the Bentley and LA from its own independent investigation—an investigation that long predated Flemming's proffer session.  Thus, the government did not breach Flemming's *Kastigar* agreement when it introduced testimony about the vehicle.

We begin by considering two common types of immunity agreements:  (a) transactional-immunity agreements and (b) use-immunity agreements.  Pursuant to a transactional-immunity agreement, the government will grant a witness who has provided "incriminating information . . . full immunity from prosecution for any offense to which the testimony relates."  *Fitch*, 964 F.2d at 575.  In contrast, use-immunity agreements—more "commonly referred to as [] *Kastigar* agreement[s]" after the Supreme Court's decision in *Kastigar v. United States*, 406 U.S. 441 (1972)—are narrower.  *United States v. Darwich*, 574 F. App'x 582, 592 (6th Cir. 2014).  Such agreements typically "preclude[] only the use of the suspect's statements in a prosecution against him."  *Id.*  Because *Kastigar* agreements are contracts, we interpret them using "contract law standards," looking to the terms of "the agreement itself" to determine whether a party has breached.  *Fitch*, 964 F.2d at 574.

There was no breach of the *Kastigar* agreement here.  Flemming in effect argues that the government used the statements he made during his proffer session against him at trial.  Flemming and the government entered into a *Kastigar* agreement on December 9, 2013, the same day Flemming proffered information to the government.  R. 525 (3/23/15 Gov't Resp. at 3–

4) (Page ID #5681–82).  Flemming stated that he "corresponded with the government about the Bentley" that Boudreau later discussed during his direct-examination testimony.  R. 545 (Trial Tr. at 8) (Page ID #6476).

However, Boudreau learned about the Bentley *eleven months* before Flemming's proffer session, when he researched the vehicle's title history.  *Id.* at 9 (Page ID #6477).  And the government knew the identity of the Bentley's intended recipient—LaMichael Finney, AKA "LA"—before Flemming's proffer session, too.  R. 525 (3/23/15 Gov't Resp. at 4–5) (Page ID #5682–83).  The government did not need to "use" Flemming's proffer statements in order to learn about the Bentley or LA—it knew about the car, and its recipient, well before December 9, 2013.

At bottom, Boudreau's testimony about the Bentley and LA was the product of the government's long-running investigation into Powell's criminal enterprise.  Because the government did not use Flemming's proffer-session statements against him, it did not violate Flemming's *Kastigar* agreement.

## D. *Brady*

### 1. Standard of Review

We review de novo whether the government breached its *Brady* obligations.  *United States v. Tavera*, 719 F.3d 705, 710 (6th Cir. 2013).  However, because Flemming failed to raise this argument before the district court, we review for plain error his *Brady* challenge on appeal.  "To succeed under plain-error review, [Flemming] 'must show (1) error (2) that was obvious or

clear, (3) that affected [his] substantial rights and (4) that affected the fairness, integrity, or public reputation of the judicial proceedings.'" *United States v. Henry*, 819 F.3d 856, 874 (6th Cir. 2016) (quoting *United States v. Solano-Rosales*, 781 F.3d 345, 351 (6th Cir. 2015)).

**2. The government did not breach its *Brady* obligations.**

Flemming argues that the government violated *Brady* when it "purposely withheld discovery information . . . of Manheim Auto Auction transactions," and that this "improper tactic" prejudiced his defense. Appellant Br. at 32. Flemming appears to argue that these records demonstrate that he spent the $230,824 in cash he deposited on legitimate purchases. Reply Br. at 10–12. Because Flemming cannot satisfy any of the elements of a cognizable *Brady* claim, this argument fails.

*Brady* set forth a bedrock criminal-procedure requirement: "Fundamental guarantees of due process require the government to provide defendants with evidence it possesses that is exculpatory and material to the defense." *Tavera*, 719 F.3d at 710. A defendant who alleges that the government has breached this obligation must satisfy three elements:

1. "The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching";

2. "[T]hat evidence must have been suppressed by the State, either willfully or inadvertently; and"

3. "[P]rejudice must have ensued."

*Strickler v. Greene*, 527 U.S. 263, 281–82 (1999).

Flemming has not satisfied any of these elements. First, Flemming has not shown that the Manheim Auto Auction records were exculpatory or could have been used for impeachment. Again, Flemming appears to argue that this evidence was exculpatory because it would have explained how he spent the cash at issue in this case. That is non-responsive to the elements of structuring under 31 U.S.C. § 5324. *See Sutton*, 387 F. App'x at 599.

Second, the government did not suppress the Manheim Auto Auction records. To the contrary, the government invited Flemming to inspect these "voluminous" records at the U.S. Attorney's Office nearly two weeks before his trial started; the government invited Flemming again after he failed to show up to inspect the documents as he had promised. R. 577-3 (3/8/15 Email from Julie Beck to Irvin Flemming at 1) (Page ID #8175).

Finally, Flemming has not shown that the Manheim Auto Auction records were material, i.e., that the government's alleged non-disclosure of this evidence prejudiced him. *See Strickler*, 527 U.S. at 280. Put simply, there was no *Brady* violation here.

**E. U.S.S.G. § 2S1.3(b)(3)**

**1. Standard of Review**

Our review of the district court's decision not to reduce Flemming's Base Offense Level under § 2S1.3(b)(3) has two parts, each with a different standard of review. We review de novo the district court's "legal conclusions regarding application of the Guidelines." *United States v. Holcomb*, 625 F.3d 287, 291 (6th Cir. 2010). We review for clear error the district court's fact-

finding supporting its refusal to apply § 2S1.3(b)(3). *United States v. Bolds*, 511 F.3d 568, 579 (6th Cir. 2007).

### 2. The district court properly declined to reduce Flemming's Base Offense Level under U.S.S.G. § 2S1.3(b)(3).

With respect to his sentencing, Flemming argues that he was entitled to receive a Base Offense Level of six under U.S.S.G. § 2S1.3(b)(3)'s safe-harbor reduction, because he did not know that the cash Powell gave him came from illegal activity. We disagree: the district court did not clearly err when it found that Flemming knew or should have known that Powell's cash came from a narcotics conspiracy.

Section 2S1.3(b)(3) provides that a defendant convicted of structuring under 31 U.S.C. § 5324 should receive a Base Offense Level of six if three conditions are met: (1) "the defendant did not act with reckless disregard of the source of the funds" that he structured, (2) "the funds were the proceeds of lawful activity," and (3) "the funds were to be used for a lawful purpose." U.S.S.G. § 2S1.3(b)(3). To avail himself of § 2S1.3(b)(3), Flemming was required to prove—by a preponderance of the evidence—all three of these conditions. *See, e.g.*, *United States v. Denson*, 728 F.3d 603, 614 (6th Cir. 2013).

The district court properly declined to reduce Flemming's Base Offense Level under § 2S1.3(b)(3). The district court reasoned that Flemming "would have known or should have known that" the money Powell gave him "c[a]me from some illegal source." R. 598 (Sentencing Tr. at 7) (Page ID #9484). Thus, the court concluded, "it could only have been with disregard or

28

reckless disregard or maybe even willful blindness that Mr. Flemming . . . would have not known about" the illicit nature of Powell's funds. *Id.*

This conclusion was not clearly erroneous. During the period when Flemming was structuring deposits, Powell was running a multi-million-dollar, multi-state narcotics conspiracy. Two salient facts from the record in this case strongly suggest that Flemming knew how Powell was earning his money. First, the pattern of Flemming's deposits makes plain that Flemming knew *something* was awry with the money Powell gave him. If Powell's money were derived from *legitimate* sources, why would Flemming deposit it in dozens of sub-$10,000 increments? Moreover, Flemming spread this money around: he and Jacqueline made deposits into five different accounts, none of which bore Flemming's name. That the money Flemming deposited was in the form of *cash* underscores our conclusion that Flemming, at minimum, recklessly disregarded the money's illegal source.

Second, Flemming knew Powell well. The two carried on an extensive professional relationship: Flemming took hundreds of thousands of dollars of Powell's money and spent it on vehicles and property. And it appears that they carried on a personal friendship, too: Powell was at Flemming's apartment when federal authorities initiated the searches that unraveled Powell's criminal enterprise.

At bottom, we agree with the district court that Flemming recklessly disregarded the illegal source of the money Powell gave him and that as a result § 2S1.3(b)(3)'s safe-harbor reduction did not apply to him.

## III.  CONCLUSION

For the reasons stated above, we **AFFIRM** Flemming's conviction and sentence.